[No. G035831. Fourth Dist., Div. Three. Oct. 6, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW KHAC VU, Defendant and Appellant.

**COUNSEL**

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Ronald A. Jakob and Jennifer A. Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FYBEL, J.—**

### INTRODUCTION

During the evening of June 7, 2002, 14-year-old Eddie Fernandez and several of his friends went to a cybercafé in Garden Grove and played games there. Eddie Fernandez never returned home. In the early morning of June 8, 2002, while on his way home, he was gunned down and bled to death.

Young Eddie Fernandez was the innocent victim of a conspiracy among members, associates, and friends of a criminal street gang. The conspirators sought revenge against a rival street gang. Fernandez and his friends who had accompanied him to the cybercafé were not gang members or associated with any street gang. The conspirators killed Eddie Fernandez because they mistook him and his friends for rival gang members. Eddie Fernandez was yet another innocent victim of criminal street gangs.

A jury convicted Andrew Khac Vu, a member of the Tiny Rascals Gang (TRG), of conspiracy to commit the murder of Eddie Fernandez (Pen. Code,

§ 182, subd. (a)(1)) (count 1); first degree murder (*id.*, § 187, subd. (a)) (count 2); and street terrorism (*id.*, § 186.22, subd. (a)) (count 3). The jury found true the allegation that Vu committed the crimes in counts 1 and 2 for the benefit of a criminal street gang. (*Id.*, § 186.22, subd. (b)(1).) The trial court sentenced Vu under count 1 to a term of 25 years to life. Under count 2, the court imposed another 25-years-to-life term to run concurrently with the count 1 sentence. Under count 3, the court imposed an eight-month term to run consecutively to the term imposed under count 1.

■ Vu argues the convictions must be reversed because accomplice testimony was not sufficiently corroborated to be admissible. We hold that independent evidence sufficiently corroborated accomplice testimony by establishing motive and opportunity, placing Vu with the conspirators on the night of the murder, and showing he gave the police a false alibi after the crime. This corroboration evidence included cell phone records establishing the conspirators, including Vu, were in continual contact with each other during the night when Fernandez was murdered. The corroboration evidence was at least as strong as that found by the California Supreme Court in *People v. Szeto* (1981) 29 Cal.3d 20 [171 Cal.Rptr. 652, 623 P.2d 213] (*Szeto*) to be sufficient to corroborate the accomplice testimony.

In addition, we conclude the evidence, including accomplice testimony, was sufficient to support the convictions; the trial court's responses to jury questions, which Vu agreed to, were not erroneous; and Vu failed to show any of the jury instructions given was ambiguous. We agree with Vu the trial court should have stayed imposition of sentence under counts 2 and 3 pursuant to Penal Code section 654.

Accordingly, we modify the judgment as set forth in the disposition, but in all other respects affirm.

### FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People v. Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110].)

### I. *Nonaccomplice Evidence of Guilt*

#### A. *Gangs and Revenge*

Vu was a member of TRG, a criminal street gang. Asian Boyz and TRG were rival street gangs. In October 2000, members of the Asian Boyz street

gang attacked three TRG members. Vu, then 17 years old, suffered a stab wound in the attack. Another TRG member, Minot Ly, also was stabbed and died in Vu's arms. Vu was devastated: Ly had been Vu's best friend.

Ly's funeral was attended by Vu, Christopher Diep (Diep), Tho That Ton (Ton), Ron Hoang Le (Le), Anthony Nguyen, and Jack Tran San (San). Diep and Vu were TRG members. Ton was associated with TRG. Le, Anthony Nguyen, and San were considered "friends" of TRG.

Several Asian Boyz gang members were convicted in connection with the October 2000 attack. But, as the prosecution's gang expert testified, such lawful process would not satisfy a criminal street gang's thirst for revenge.

### B. *Fernandez Is Gunned Down.*

On June 7, 2002, about 6:00 p.m., Eddie Fernandez and his friends B., M., and S.[1] walked to the I.C.E. cybercafé on Brookhurst Street and Chapman Avenue in Garden Grove. All were 14 years old, and none was a gang member. All are Hispanic, except for M., who is Asian. At the cybercafé, they played Counter-Strike, a computer game.

About 9:30 or 10:00 p.m. on June 7, a group of about 20 youths, mainly Asians, arrived at the I.C.E. cybercafé in 15 to 20 cars. Most stayed outside and loitered; some walked inside to use the restroom. The proprietor of the I.C.E. cybercafé had a continuing problem with loiterers, and the restroom wall and the pool table at the I.C.E. cybercafé had been tagged with the initials "A.B."

The cybercafé owner told Fernandez and his friends they had to leave because curfew had passed. Afraid of the people loitering outside, Fernandez and his friends waited a while before calling for a taxi.

A black Acura Integra circled the parking lot as Fernandez and his friends waited outside for the taxi to arrive. The four young men inside the black Acura "mad dogged" (gave angry or ugly looks to) Fernandez and his friends. The Acura stopped, the front seat passenger flicked a cigarette toward the foursome, and the car sped off. M. earlier had seen the four men in the Acura playing pool at the I.C.E. cybercafé. At trial, B. identified the person flicking the cigarette as San. Fernandez and his friends did not want trouble, so some of them went back inside the cybercafé to wait for the taxi.

The taxi finally arrived. Fernandez, B., M., and B.'s friend Michael got inside. S. decided to use other means to go home. Fernandez sat in the middle

---

[1] We use initials for minors rather than names to protect their identity from disclosure.

of the backseat, with Michael and M. on either side of him, and B. sat in the front passenger seat. The taxi traveled down Brookhurst Street and made a right turn on Lampson Avenue. At the intersection of Lampson Avenue and Magnolia Street, B. noticed a car behind the taxi, and Michael said someone was following them. M. turned and saw a black Acura Integra following the taxi.

The foursome asked the taxi driver to stop on Adelle Street, near S.'s house, because they did not have enough money to go farther. As they got out of the taxi, B. heard car brakes slam. He looked over and saw a black car. At trial, for the first time, B. described that car as the black Acura that had circled the cybercafé parking lot. B. testified a man with black, "spiked" hair got out of the Acura from the front passenger seat and started firing a gun aimed straight at them. At trial, for the first time, B. identified the man shooting as San. After hearing gunshots, B. and M. first ran behind a car to hide, then ran into an apartment complex to wait for the Acura to leave. A minute later, they hopped a fence and ran to another apartment complex. While running, they saw the black Acura Integra drive into the spot where they had been.

At trial, M. testified a white Toyota and a black Acura stopped behind the taxi as he and his friends stepped out of it. A man with black, slicked-back hair got out of the white Toyota. He had a gun. M. could not identify the man in a police interview following the crime. At trial, for the first time, M. identified the man as San. M. testified a bald-headed man got out of the black Acura. Both the bald-headed man and San started shooting at M., B., Michael, and Fernandez.

Around 12:50 a.m. on June 8, Garden Grove Police Officer Michael Reynolds was dispatched to the scene of a shooting on Adelle Street. When Reynolds arrived at the scene, he saw a yellow taxi parked in the street and a white Toyota that had jumped the curb. The Toyota's engine was running, a key was in the ignition, and the driver's side door was jammed open against a fence. A vehicle check disclosed the Toyota was stolen. The taxi's rear passenger door was open. Fernandez was lying on the pavement near the door. He had lost a large amount of blood from a gunshot wound to his left side, but was alive. Reynolds and two other police officers tended to Fernandez until paramedics arrived and transported him to a hospital.

Fernandez bled to death. He had suffered five gunshot wounds, perforating his right lung, right diaphragm, liver, spleen, abdominal aorta, inferior vena cava, and bowel.

A revolver was found near the intersection of Beach Boulevard and Trask Avenue in Garden Grove. The revolver's chamber held two empty shell

casings. A forensic scientist determined the five bullets removed from Fernandez's body were fired from that revolver.

### C. *Vu's Police Interview*

The police interviewed Vu on June 10, 2002. The interview was video-taped. The videotape was marked as exhibit 43 and played for the jury. A transcription of the videotape was marked as exhibit 44 and published to the jury.

Vu told the police he had been "jumped" into TRG at age 16, but claimed he had been "jumped out" a few months after Ly was killed. He said he drove a black Toyota Corolla. He said he loaned the car to Khoi Nguyen on June 9, 2002. Vu said he went to Vi Thao (Vicki) Bui's house in the evening of Friday, June 7, to watch a basketball game. He claimed that when the game ended, he, Khoi Nguyen, and Bui went to see the 10:15 p.m. showing of Spider-Man (Columbia Pictures/Sony 2002) at Triangle Square in Costa Mesa. When the movie ended, sometime after midnight, the three of them went to a cybercafé in Costa Mesa. They stayed there for about an hour, then returned to Bui's house. Vu claimed he stayed the night at Bui's house, while Khoi Nguyen left in his own car.

Vu told the police he saw Ton at Ly's funeral, but denied knowing him. Vu said he would use Bui's cell phone when he needed to make a call because the terms of his probation forbade him from having a cell phone.

### D. *Chanh Nguyen's Testimony*

A friend of Vu, Chanh Nguyen, testified Vu spent the evening of June 7 watching a basketball game on television at the home of a friend's sister in Huntington Beach. When the game ended, about 9:00 p.m., Vu, Chanh Nguyen, and several others went to a bowling alley, and then to Kha Tran's house, which was near the intersection of Bushard Street and McFadden Avenue in Westminster. Tran and Diep also were at Tran's house. When Chanh Nguyen left Tran's house, sometime between 11:00 and 11:30 p.m., Vu, Diep, and Tran were still there. Chanh Nguyen noticed Vu was driving a black Toyota Corolla that evening. Chanh Nguyen also noticed a white Toyota Camry parked outside Tran's house.

### E. *Cell Phone Records*

Garden Grove Police Department Detective Elaine Jordan gathered the records of cell phones used by Bui, Diep, Tran, Le, and Ton for June 7 and 8,

2002. With the assistance of crime analyst Nancy McFaul, Jordan created a chart showing usage for each cell phone. That information was plotted onto a map.

Jordan determined that in the late night hours of June 7 and the early morning hours of June 8, Diep's and Le's cell phones registered at cell sites in the Garden Grove area. Tran's cell phone registered at cell sites in the Westminster/Garden Grove area. Bui's cell phone registered at cell sites in Anaheim, then in Garden Grove and Westminster. None of the information gathered indicated that Bui's cell phone was ever used near Triangle Square in Costa Mesa.

The information gathered and organized by Jordan and McFaul established this following chronology of calls made from Bui's, Diep's, Tran's, and Le's cell phones.

*June 7, 2002.* 10:30 p.m., Diep's phone called Tran's phone. 10:57 p.m., Bui's phone called Tran's phone. 10:58 p.m., Bui's phone called Le's phone. 11:01 p.m., Bui's phone called Diep's phone. 11:15 p.m., Bui's phone called Le's phone. 11:21 p.m., a call registered to Le's phone.

*June 8, 2002.* 12:03 and 12:37 a.m., Tran's phone called Diep's phone. 12:38 and 12:41 a.m., Diep's phone called Le's phone. 12:43 a.m., Diep's phone called Tran's phone. (Fernandez was killed about 12:45 a.m.) 12:45 a.m., Tran's phone called Diep's phone. 12:45, 12:50, and 12:53 a.m., Diep's phone called Le's phone. 1:14 a.m., Diep's phone called Ton's phone. 1:14 and 1:16 a.m., Diep's phone called Le's phone.

According to Jordan, the cell phone records showed that from 12:08 to 12:45 a.m. on June 8, the cell site at 9501 Chapman Avenue, Garden Grove, registered more than 20 calls exchanged between Diep's and Tran's cell phones. The gun used to kill Fernandez was found at a point between the place where he was killed and the cell site where Diep's phone had called Ton's phone at 12:50 a.m.

## II. *Accomplice Testimony*

### A. *Jack San's Testimony*

San was friends with Ton and Le, and knew Diep. San had seen Vu at parties but did not know him personally.

On June 7, 2002, around 9:00 p.m., San was shooting pool with Ton, Le, and Anthony Nguyen at the I.C.E. cybercafé. A group of about 20 young men

entered the parking lot outside the I.C.E. cybercafé. Most of them were Asian, had "spikey" hair or shaved heads, and were dressed in baggy pants and baggy shirts. Five or so of them entered the cybercafé. Ton told San the men were "enemies" and alerted the manager. The group looked at San and his friends, and made hand gestures toward Ton, indicating they wanted him to come outside. Ton told San the manager had contacted the police, but they were not going to come.

San noticed the group outside had grown to 30 to 40 people. Ton was "pretty frightened." Ton again alerted the manager, who again contacted the police. Before the police arrived, the group outside disbursed in about 10 cars.

San, Ton, Le, and Anthony Nguyen stayed inside the I.C.E. cybercafé until they felt safe to leave. Around midnight, they left in Le's car, a black Acura Integra. Ton drove. Anthony Nguyen and San sat in the backseat. They soon turned back toward the cybercafé because Anthony Nguyen realized he had left his identification there. When they entered the cybercafé parking lot, Ton recognized a few of the young men from earlier that night. He said there were too many people outside and suggested they come back later to retrieve the identification.

When San and the others returned to the I.C.E. cybercafé a second time to retrieve Anthony Nguyen's identification, they saw a taxi pull up. Ton said he recognized a few of the people getting into the taxi. Ton used Le's cell phone to make a call. San did not know whom Ton called, but he heard Ton tell the listener that he "saw some people get in a taxi . . . I don't know who's in there, but check who it is." Ton told the listener the taxi had turned on Lampson Avenue, and the call ended. During his police interview, San stated that Ton had used the cell phone to call "Drew Ha"—Vu's gang moniker.

San's group in the black Acura followed the taxi down Lampson Avenue. San thought there might be a fight between the group in the Acura and the taxi's occupants. The taxi drove through a yellow light at Magnolia Street. The Acura stopped for the red light. While the Acura waited for the light to change, two cars sped past, driving into the opposite lane of travel to pass the Acura, and ran the red light. One car was a dark color and the other was white. Both were sedans.

When the light turned green, the black Acura continued down Lampson Avenue until the taxi, followed by the two cars, turned left onto another street. As the black Acura turned left onto the same street, San saw a man shooting at the taxi. When San heard the gunfire, he looked away. He did not recognize the shooter and could not identify the type of gun he was firing. Ton kept driving.

When the Acura reached Beach Boulevard, Ton received a cell phone call. San heard Ton tell the caller, "I know, I know." Ton spoke briefly to the caller then ended the call. Ton said to San and the others in the Acura, "[y]ou didn't see anything."

Ton drove the Acura to the home of Paul Bui (Vicki Bui's brother), and from there, everyone went their separate ways.

B. *Vicki Bui's Testimony*

Vicki Bui was associated with TRG. She knew Vu through Ly, her ex-boyfriend. Ly and Vu were best friends. Bui knew that Ly was a TRG member and believed Vu was too. Vu told Bui he was sad and "devastated" by Ly's murder. Vu also told Bui he believed Asian Boyz had killed Ly.

Around noon on June 7, 2002, Vu arrived at Bui's house in Santa Ana. Vu, Bui, and Khoi Nguyen "hung out" for about 30 minutes. Bui's recollection of what happened over the next several hours was inconsistent, but Bui testified she saw Vu at her sister's house in Huntington Beach at 6:00 or 7:00 p.m. that evening. Vu was there with a group of people, including Khoi Nguyen, Chanh Nguyen, and Diep, to watch the Lakers game on television. When the game ended at 9:00 or 10:00 p.m., the group drove to a pool hall at the intersection of Beach Boulevard and Katella Avenue. After about 20 minutes, the group drove to a bowling alley at the intersection of Brookhurst Street and Ball Road.

About five minutes later, the group departed the bowling alley and drove to Tran's house near the intersection of Magnolia Street and McFadden Avenue. Tran was Vu's friend and a TRG member. Vu drove to Tran's house in a black Toyota Corolla.

Bui was in a separate car. Around 11:00 p.m., as the car passed by the I.C.E. cybercafé, Bui received a cell phone call from Ton. He asked to talk to Diep. Bui handed the phone to Mark Aquino, who told Ton, "there was Asian Boyz here."

Bui arrived at Tran's house about 15 minutes later. Vu was already there. Bui saw his black Toyota Corolla parked outside. She also saw a white Toyota Camry at Tran's house.

While at Tran's house, Bui received another cell phone call from Ton, who again asked to speak to Diep. Bui handed the phone to Diep. She became frightened when she heard Diep say to Ton, "the gun's at Ken's house." Vu was standing five to 10 feet from Diep when he made that statement. Diep

received more calls from Ton on Bui's cell phone. Around 11:30 p.m., Diep told Vu to come with him. Vu and Diep drove off in Vu's black Toyota Corolla. Tran drove off in his white Toyota Camry. Before leaving, Vu told Bui, "we'll be back."

Bui went to a cybercafé in Costa Mesa before returning home between 1:00 and 1:30 a.m. on Saturday, June 8. Around 2:00 a.m. on Sunday, June 9, Bui received a cell phone call from Aquino, who asked if he, Vu, and Diep could come over immediately and sleep at her house. Upon their arrival, Vu told Bui, "[i]f anybody asks, I was with you on Friday." Bui did not question Vu, and he said nothing more.

Bui, Vu, Diep, and Aquino awoke about 11:00 a.m. on Sunday morning. Khoi Nguyen arrived at Bui's house, and the group went to a cybercafé in Costa Mesa. At the cybercafé, Vu told Bui that "if anyone asks, tell them you were with me on Friday at Triangle Square"; "we were watching a movie, Spiderman, around 10:00 o'clock"; and "then we went to Cyber City." Bui asked Vu why she should say that. Vu replied, "just say that."

On Sunday afternoon, Vu asked Khoi Nguyen to rent him a motel room and said Aquino would give Khoi Nguyen the money for the room. Bui testified that Vu normally stayed in motel rooms. Bui rented a room for Vu at the Fire Station Motel at the intersection of Harbor and Garden Grove Boulevards. After renting the room, Bui and Khoi Nguyen left to pick up food from a Thai restaurant, where Khoi Nguyen obtained a newspaper. Bui noticed an article in the paper about a boy who had been shot near the I.C.E. cybercafé. The article prompted her to think about what Vu had told her to say if questioned about his whereabouts on Friday night. The article also reminded Bui of Diep's comment, made earlier that day, that Ton had been "locked up" for a shooting.

While in custody, Vu called Bui and told her he had been arrested for a probation violation. He told her he did not know why he was being accused "of things." Vu asked Bui if the police had come to her house, and again told her they had been at Triangle Square on the night of Friday, June 7.

### III. *Defense Evidence*

Defense evidence included the videotapes and transcripts of the police interviews of Bui and San. In addition, Vilakone Visaychack and forensic specialists Lisa Zinn, Grant Fry, Karen Ford, Kenneth Thompson, and Slavco Arsovski testified on Vu's behalf.

In June 2002, Zinn obtained major case prints and photographs of Vu. On June 12, 2002, Fry obtained 12 fingerprint lift cards from a black 1996

Toyota Corolla with license plate number 3SRV047. Ford matched fingerprint exemplars taken from Vu and Bui with prints from the black Toyota Corolla and items found inside the car. Ford did a similar comparison between a fingerprint exemplar taken from Tran, and prints found inside a white Toyota Camry with license plate number 2KPX495. She was unable to make an identification. Thompson did fingerprint processing on numerous items of evidence, including a gun, shell casings, a bullet fragment, seven cigarette butts, and the interior of two cars. Thompson found no fingerprints on the gun, shell casings, and bullet fragment.

Arsovski compared a DNA swab taken from the gun in this case to Vu's DNA typing. He concluded Vu was not a major contributor to the DNA collected from the gun. The test was inconclusive as to whether Vu was a minor contributor. Arsovksi could not say Vu never touched or fired the gun.

Visaychack testified he was at the I.C.E. cybercafé on the night of June 7, 2002. There, he met his friends Ton, Le, Anthony Nguyen, and San. Visaychack did not know Vu. About 11:30 p.m., Visaychack observed Ton make a call on Le's cell phone. Visaychack recalled a large group of people gave him and his friends dirty looks. He testified he received two calls on his cell phone, one at 12:10 a.m. and the other at 12:22 a.m. The caller asked for Ton. Visaychack did not recognize the caller's voice and handed the phone to Ton.

Visaychack testified that about two months before Fernandez was killed, Ton showed him a gun kept in Ton's dresser drawer.

Analysis

I. *Independent Evidence Corroborated the Accomplice Testimony.*

Vu contends independent evidence did not sufficiently corroborate San's and Bui's accomplice testimony, as required by Penal Code section 1111, which provides, in relevant part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."[2]

■ Under Penal Code section 1111, the jury had to conclude independent evidence linked Vu to the crime before relying on San's and Bui's trial

---

[2] The trial court deemed San and Bui to be accomplices as a matter of law.

testimony. (*People v. Davis* (2005) 36 Cal.4th 510, 543 [31 Cal.Rptr.3d 96, 115 P.3d 417] (*Davis*).) The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, so long as it tends to implicate the defendant by relating to an act that is an element of the crime. (*Ibid.*; *People v. McDermott* (2002) 28 Cal.4th 946, 986 [123 Cal.Rptr.2d 654, 51 P.3d 874].) The independent evidence need not corroborate the accomplice as to every fact on which the accomplice testifies (*Davis*, at p. 543) and need not establish every element of the charged offense (*People v. McDermott*, at p. 986). The corroborating evidence is sufficient if, without aid from accomplice testimony, it " ' "tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth." ' " (*Davis*, at p. 543; *People v. Williams* (1997) 16 Cal.4th 635, 680–681 [66 Cal.Rptr.2d 573, 941 P.2d 752].)

The corroborating evidence here met that standard. The evidence, independent of San's and Bui's testimony, connected Vu to the crime by establishing motive and opportunity and by discrediting Vu's alibi. The evidence established Vu was a TRG member, as were Diep and Tran. Ton and Bui were associated with TRG. TRG and the Asian Boyz were rival gangs. About a year and a half before Fernandez's murder, members of the Asian Boyz attacked and killed Ly, Vu's closest friend. Ly died in front of Vu, who was wounded in the attack. Vu, Diep, and Ton attended Ly's funeral. Detective Vi, the prosecution's gang expert, testified the crime in this case was committed at the direction and for the benefit of a criminal street gang.

Chanh Nguyen testified he saw Vu at Tran's house between 10:00 and 11:00 p.m. on June 7, 2002. Chanh Nguyen testified Vu was driving a black Toyota Corolla that evening. Chanh Nguyen also saw a white Toyota Camry at Tran's house. An abandoned white Toyota Camry was found at the crime scene.

Chanh Nguyen connected Vu with the crime in two significant ways. First, Chanh Nguyen placed Vu at Tran's home with other TRG members and associates on the night of June 7, 2002. Second, Chanh Nguyen discredited Vu's alibi. In his police interview, Vu told the police he had been at Triangle Square watching the movie Spider-Man on the night of June 7.

A defendant's own testimony may be sufficient corroborative testimony, and false or misleading statements made to authorities may constitute corroborating evidence. (*People v. Ruscoe* (1976) 54 Cal.App.3d 1005, 1012 [127 Cal.Rptr. 6]; see *People v. Santo* (1954) 43 Cal.2d 319, 327 [273 P.2d 249] ["False and contradictory statements of a defendant in relation to the charge are themselves corroborative evidence"].) By proving Vu was not at Triangle

Square on the night of June 7, Chanh Nguyen's testimony made Vu's statements during the police interview corroborative evidence.

In addition, records for Bui's cell phone established no calls from her phone registered near Triangle Square in the late night hours of June 7 and the early morning hours of June 8, 2002. Those records showed Bui's cell phone registered at a cell site on Brookhurst Street at 10:58 p.m.—just at the time Vu claimed he was at Triangle Square with Bui.

Vu contends we cannot consider Bui's cell phone records as corroborative evidence because accomplice testimony was needed to authenticate them. Bui's testimony was unnecessary to authenticate her cell phone records. Brett Trimble, the custodian of records for Sprint Communications Company, authenticated the cell phone records (exhibits 13A, 13B, 13C) as business records. In addition, the reasons for requiring corroboration of accomplice testimony do not apply to the cell phone records. Accomplice testimony is viewed with caution and suspicion because it comes from a " 'tainted' " source and might have been given in the hope or expectation of leniency. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 967 [127 Cal.Rptr. 135, 544 P.2d 1335].) The cell phone records, in contrast, are business records created independently of the accomplice and unaffected by the accomplice's credibility.

The corroborating evidence here was at least as strong as that held to be sufficient in *Szeto, supra,* 29 Cal.3d 20. In *Szeto*, members of an Asian street gang sought revenge against a rival gang by firing guns into a crowded restaurant where rival gang members were believed to be eating. (*Id.* at p. 26.) Several bystanders were killed. (*Ibid.*) The defendant was convicted of being an accessory to a felon for his role in disposing of the weapons. (*Ibid.*) An accomplice testified that on the morning after the shooting spree, the defendant brought the killers food, placed the guns in his car, drove to a spot along San Francisco Bay, and threw the guns in the water. (*Id.* at p. 27.)

Corroborating testimony evidence established (1) the defendant was a member of the Joe Boys gang; (2) Joe Boys was a rival of the Wah Ching and Hop Sing gangs, and the rivalry had erupted into warfare; (3) Wah Ching and Hop Sing gang members had killed a Joe Boys gang member; (4) the defendant attended the funeral of the fellow gang member killed by the rival gangs; (5) on the morning after the restaurant killings, the defendant brought food to the house where the killers were staying; and (6) the guns used the previous night were inside the house when the defendant brought the food. (*Szeto, supra,* 29 Cal.3d at p. 28.) The California Supreme Court held this testimony established the defendant had a motive and the opportunity to aid the killers and therefore was sufficient corroboration of the accomplice testimony. (*Ibid.*)

In this case, in addition to evidence similarly establishing motive and opportunity, there was evidence Vu made false statements to the police about his whereabouts on the night of June 7, 2002.

## II. *Substantial Evidence Supports the Convictions.*

Vu argues the evidence was insufficient to support the convictions. We conclude the evidence, albeit circumstantial, was sufficient.

Because Vu challenges the sufficiency of the evidence to support his convictions, we examine "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Thomas* (1992) 2 Cal.4th 489, 514 [7 Cal.Rptr.2d 199, 828 P.2d 101] (*Thomas*).) We view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier of fact reasonably could deduce from the evidence. (*People v. Barnes, supra,* 42 Cal.3d 284, 303.) The jury, not the appellate court, must be convinced of guilt beyond a reasonable doubt; for us, "[t]he test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

The standard of review is the same when the prosecution relies on circumstantial evidence. (*Thomas, supra,* 2 Cal.4th 489, 514.) Circumstantial evidence may be sufficient to prove the defendant's guilt beyond a reasonable doubt. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

■ The jury convicted Vu of conspiracy to commit murder, first degree murder, and street terrorism. A conspiracy is an agreement by two or more persons to commit any crime. (Pen. Code, § 182, subd. (a)(1); *People v. Morante* (1999) 20 Cal.4th 403, 416 [84 Cal.Rptr.2d 665, 975 P.2d 1071].) A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. (Pen. Code, §§ 182, subd. (b), 184; *People v. Morante, supra,* 20 Cal.4th at p. 416; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 68, p. 277.)

The elements of conspiracy may be proven with circumstantial evidence, "particularly when those circumstances are the defendant's carrying out the

agreed-upon crime." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1464 [83 Cal.Rptr.2d 307] (*Herrera*); see also *People v. Osslo* (1958) 50 Cal.2d 75, 94–95 [323 P.2d 397].) To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, "a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design." (*People v. Brown* (1969) 272 Cal.App.2d 623, 628 [77 Cal.Rptr. 650].)

■ A conviction of conspiracy to commit murder requires a finding of intent to kill. (*People v. Swain* (1996) 12 Cal.4th 593, 607 [49 Cal.Rptr.2d 390, 909 P.2d 994].) Because there rarely is direct evidence of a defendant's intent, "[s]uch intent must usually be derived from all the circumstances of the attempt, including the defendant's actions." (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [60 Cal.Rptr.2d 761].)

There was sufficient evidence that Vu and his coconspirators expressly or tacitly reached an agreement to murder Fernandez, mistaken to be an Asian Boyz gang member, as revenge for the killing of Ly. The evidence was very strong that Vu and the other conspirators had a motive for the killing. The evidence established Vu was a member of TRG, a criminal street gang, as were Diep and Tran. Ton and Bui were associated with TRG, and Le, Anthony Nguyen, and San were friendly toward TRG. Asian Boyz and TRG were rival gangs.

Asian Boyz gang members attacked Vu and Ly, who was Vu's close friend and Bui's former boyfriend. Ly died in Vu's arms. Vu was wounded in the attack. The prosecution's gang expert testified convictions for the October 2000 attack would not satisfy a criminal street gang's thirst for revenge.

During the evening of June 7, 2002, several TRG associates and friends spotted Asian Boyz gang members at the I.C.E. cybercafé. The Asian Boyz used the I.C.E. cybercafé as a hangout. The proprietor testified the restroom wall and the pool table at the I.C.E. cybercafé had been tagged with the initials "A.B." On June 7, around 9:00 p.m., San, Ton, Le, and Anthony Nguyen arrived at the I.C.E. cybercafé in Le's car, a black Acura Integra. About 9:30 or 10:00 p.m. on June 7, a group of about 20 youths, mainly Asians, arrived at the I.C.E. cybercafé in 15 to 20 cars. The group included Samoans and Hispanics. Five or so of the Asian Boyz gang members made gestures toward Ton, indicating they wanted him to come outside. The threat had been made.

Around 11:00 p.m. on June 7, Bui received a call from Ton just as she and several others were driving past the I.C.E. cybercafé on their way to Tran's

house. Ton asked to speak to Diep. Aquino told Ton, "there was Asian Boyz here." Records established Bui's cell phone received calls from Le's cell phone (in the black Acura) at 11:15 p.m. Bui's cell phone made a call to Le's phone at 11:21 p.m. The word was spreading that Asian Boyz were at the I.C.E. cybercafé.

Sadly, Eddie Fernandez and his friends B., M., and S. also were at the I.C.E. cybercafé on the night of June 7, 2002. The proprietor told them they had to leave because curfew had passed. Fernandez and his friends waited outside for the taxicab to arrive.

By this time, San and the others were circling the parking lot in the black Acura Integra. San, Le, Ton, and Anthony Nguyen saw Fernandez and his friends and formed the belief they might be Asian Boyz gang members. M. is Asian. Although Fernandez, B., and S. are Hispanic, San and his group might have believed they were Samoan, or Hispanic associates of Asian Boyz. San and the others in the black Acura "mad dogged" (gave angry or ugly looks to) Fernandez and his friends. The Acura stopped, San (the front seat passenger) flicked a cigarette toward the foursome, then the car sped off.

San and his friends left the I.C.E. cybercafé but soon returned to retrieve Anthony Nguyen's identification. When they returned, they saw some of the Asian Boyz gang members. When San and his friends returned a second time, they saw a taxicab pull up, and Ton claimed to recognize a few of the people getting into it.

San and the others in the black Acura believed the passengers in the taxi might be Asian Boyz gang members. At this point, a conspiracy was formed through a series of cell phone calls, evidenced by the cell phone records. The purpose of the conspiracy was to kill the passengers in the taxi, who were mistaken to be Asian Boyz gang members.

During his police interview, San stated that Ton had called "Drew Ha"— Vu's gang moniker. Because Asian Boyz gang members had killed Vu's close friend Ly, it made sense to initiate the conspiracy by calling Vu. San testified he heard Ton tell the listener that he "saw some people get in a taxi . . . I don't know who's in there, but check who it is." Ton then told the listener the taxi had turned on Lampson Avenue, and the call ended. San's group in the black Acura followed the taxi down Lampson Avenue.

Chanh Nguyen's and Bui's testimony placed Vu at Tran's house between 11:00 and 11:30 p.m. on June 7. Tran and Diep also were at Tran's house. Vu had driven to Tran's house in a black Toyota Corolla. Both Chanh Nguyen and Bui testified seeing a black Toyota Corolla parked outside Tran's house. They also testified seeing a white Toyota Camry parked at Tran's house.

Bui testified that while at Tran's house, she received another cell phone call from Ton, who again asked to speak to Diep. Bui heard Diep say to Ton, "the gun's at Ken's house." Vu was standing five to 10 feet from Diep when he made that statement. Visaychack testified that about two months before Fernandez was killed, Ton showed him a gun kept in his dresser drawer. Bui became frightened when she heard the word "gun." She gave her cell phone to Diep, and he received more calls from Ton, who was using Le's cell phone. Cell phone records show that Bui's cell phone received six calls from Le's cell phone between 11:23 and 11:48 p.m. on June 7, 2002. Vu did not have his own cell phone because the terms of his probation forbade him to have one, and therefore relied on Bui's or Diep's cell phone to communicate with the other conspirators.

After speaking with Ton, Diep told Vu to come with him. Since Vu had been standing near Diep when he told Ton "the gun's at Ken's house," a reasonable inference was that Vu understood they were leaving to retrieve the gun.

Vu and Diep drove off in Vu's black Toyota Corolla. Tran drove off in his white Toyota Camry. Before leaving, Vu told Bui, "we'll be back."

At this point, three cars are in play: Le's black Acura Integra, Vu's black Toyota Corolla, and a white Toyota Camry. San, Ton, Anthony Nguyen, and Le were in the black Acura. They were communicating with the others via Le's cell phone. Vu and Diep were in the black Toyota Corolla. They were using Diep's cell phone. Tran was driving the white Toyota Camry and using his own cell phone. Vu, Diep, and Tran were TRG members. The occupants of the black Acura were associated or friendly with TRG, but were not gang members.

As the three cars converged on the taxi, the cars' occupants remained in continual contact. Cell phone records established Le's cell phone received calls from Diep's cell phone at 12:37, 12:38, 12:39, 12:41, 12:44, 12:47, 12:50, and 12:52 a.m. on June 8, 2002. Le's cell phone called Diep's cell phone at 12:27, 12:32, and 12:41 a.m. on June 8. Tran's cell phone called Diep's cell phone at 11:06, 11:09, and 11:48 p.m. on June 7, and at 12:03, 12:08, 12:36 a.m., and three times at 12:45 a.m. on June 8. Tran's cell phone received calls from Diep's cell phone at 11:03, 11:40, and 11:50 p.m. on June 7, and at 12:02, 12:35 (twice), and 12:43 a.m. on June 8. Diep's cell phone called Le's cell phone at 11:49 p.m. on June 7 and at 12:32, 12:34, 12:38, 12:41, 12:42, 12:45, 12:50, and 12:53 a.m. on June 8. All three cell phones were in periodic contact with Bui's cell phone. Diep's and Le's cell phones registered at cell sites in the Garden Grove area. Records showed that between 12:08 and 12:45 a.m. on June 8, when Fernandez was shot, the cell

site at 9501 Chapman Avenue in Garden Grove registered more than 20 calls exchanged between Tran's cell phone (in the white Toyota Camry) and Diep's cell phone (in the black Toyota with Vu).

San testified the taxi drove through a yellow light at Magnolia Street. The Acura stopped for the red light. San further testified that while the Acura waited for the light to change, two cars sped past, driving into the opposite lane of travel to pass the Acura, and ran the red light. One car was a dark color and the other was white. Both were sedans. A reasonable inference is that one car speeding through the red light was Vu's black Toyota Corolla, and the other was the white Toyota Camry driven by Tran.

San testified that when the light turned green, the Acura continued on Lampson Avenue until the taxi, followed by the two cars, turned left onto another street. As the Acura turned left onto the same street, San saw a man, shooting at the taxi. San testified Ton continued driving.

When the Acura reached Beach Boulevard, Ton received a cell phone call. San heard Ton tell the caller, "I know, I know." Ton spoke briefly to the caller then ended the call. Ton told San and the others in the Acura, "[y]ou didn't see anything." Fernandez was shot about 12:45 a.m. on June 8. Diep's cell phone called Le's cell phone at 12:41, 12:42, 12:45, 12:50, and 12:53 a.m. on June 8. Tran's cell phone did not call Le's cell phone during that time period.

A white Toyota Camry had been abandoned at the crime scene. That car had been reported stolen.

A reasonable inference from this evidence is that Vu, who was driving a black Toyota Corolla, was at the crime scene. Another reasonable inference is that one of the occupants of the black Toyota Corolla or white Toyota Camry—Tran, Diep, or Vu—was the shooter and that Diep or Vu (who were both in Vu's car) had called Le's cell phone to report the shooting. Those inferences are all the more reasonable because they leave the three actual TRG members as the ones who carried out the revenge against mistaken Asian Boyz gang members.

Vu asserts the prosecution evidence backfired in that B. and M. (1) identified San, not Vu, as the shooter, and (2) testified the black Acura, not Vu's black Toyota Corolla, stopped behind the taxi. On the night of the killing, police investigators spoke with B. and M. At trial, B. testified he remembered being interviewed and remembered telling the police he could not identify the shooter or the kind of car that had stopped behind the taxi. B. also testified his memory was fresher when the police interviewed him after the killing than it was at trial. At trial, B. suddenly, and for the first time, identified the shooter as San and was "positive" a black Acura Integra pulled up behind the taxi.

What happened between the police interview and the trial? B. testified he saw San while standing in the court hallway just before testifying. Perhaps seeing San triggered B.'s memory. The prosecutor's questioning revealed another possibility. In response to questioning, B. testified he was nervous and scared about coming to court to testify. "Are you scared right now a little bit?" the prosecutor asked. "Yes," B. responded; he was scared. The prosecutor asked, "Were you a little nervous about who might be here today?" B. answered, "Yes."

M. too could not identify the shooter when questioned by the police the night Fernandez was killed. Apparently, M. told the police he saw the shooter step out of a black Acura and identified Vu as a *passenger* in the black Acura. However, at trial, M. testified that *San* stepped out of a *white Toyota* and started shooting. Indeed, at trial, M. was "positive" that San was the one who started shooting. M. had never told police officers that San was the shooter. Between the police interview and the trial, M. never saw San in person and saw his photograph only once in a newspaper. M., as B., saw San in the court hallway, and testified that, upon seeing San, "I had a feeling it was him."

■ The jury is the ultimate judge of credibility. The jury may find a witness is credible in some respects and not in others; it may believe parts of a witness's testimony without believing all of it. (*People v. Williams* (1992) 4 Cal.4th 354, 364 [14 Cal.Rptr.2d 441, 841 P.2d 961].) The jury in this case would be fully justified in concluding B.'s and M.'s sudden and unexpected identification of San as the shooter was either mistaken, or the product of fear.

■ In addition, the evidence established that after the crime Vu behaved in a manner displaying consciousness of guilt. Evidence the defendant used a false alibi is relevant to prove consciousness of guilt. (*Thomas, supra,* 2 Cal.4th 489, 516; *People v. Osslo, supra,* 50 Cal.2d 75, 93.) "[T]here can be no question that evidence of such falsehoods is admissible as indicating a consciousness of guilt." (*People v. Jenkins* (1979) 91 Cal.App.3d 579, 585 [154 Cal.Rptr. 309].)

Vu concocted an alibi for his whereabouts on the late night of June 7 and early morning of June 8. He told Bui in the early morning of Sunday, June 9, "[i]f anybody asks, I was with you on Friday." At the cybercafé later that day, Vu told Bui that "if anyone asks, tell them you were with me on Friday at Triangle Square," that "we were watching a movie, Spiderman, around 10:00 o'clock," and that "then we went to Cyber City." Bui asked Vu why she should say that. Vu replied, "just say that." While in custody, Vu again told Bui they had been at Triangle Square on the night of Friday, June 7. Chanh Nguyen's and Bui's trial testimony, and Bui's cell phone records proved that alibi false.

Vu lied to the police. He repeated his false alibi that he went with Bui on June 7 to see the 10:15 p.m. showing of Spider-Man at Triangle Square in Costa Mesa. Vu told the police that when the movie ended, sometime after midnight, they went to a cybercafé in Costa Mesa.

Relying on *People v. Blakeslee* (1969) 2 Cal.App.3d 831 [82 Cal.Rptr. 839] (*Blakeslee*), Vu argues evidence of false alibi, together with evidence of motive and opportunity, is insufficient to support a conviction. In *Blakeslee*, proof of guilt consisted primarily of evidence of opportunity and motive, together with a false alibi indicating the defendant's consciousness of guilt. The Court of Appeal discounted the evidence of false alibi as consciousness of guilt because the defendant had a plausible explanation for lying. (*Id.* at p. 839.) The court concluded the evidence of guilt was insubstantial in light of the prosecutor's failure to produce the murder weapon or to link the defendant with the crime. (*Id.* at pp. 839–840.) The *Blakeslee* court explained, "[t]his negation of a negative (she was not there) does not amount to affirmation of a positive (she did the shooting)." (*Id.* at p. 839.)

In *Thomas, supra,* 2 Cal.4th at page 516, the proof of guilt also consisted primarily of evidence of opportunity, motive, and false alibi. The California Supreme Court, affirming defendant Thomas's conviction, distinguished *Blakeslee* on the ground Thomas had no plausible explanation for a false alibi, other than to shift responsibility away from himself. (*Ibid.*)

Here, unlike *Blakeslee* and like *Thomas,* Vu had no plausible explanation for lying. Vu argues he gave a false alibi because it was a violation of his probation to be out after curfew or to be associating with gang members. That explanation is implausible. Vu's alibi was an admission of being out past curfew, a probation violation. Here, unlike *Blakeslee*, there was, in addition to evidence of motive, opportunity, and false alibi, evidence of Vu's participation in the murder. In other words, the prosecution did not prove Vu's guilt simply by "negati[ng] . . . a negative" by proving the alibi false. (*Blakeslee, supra,* 2 Cal.App.3d at p. 839.)

The evidence also showed that Vu tried to hide after the crime. Such evidence of flight immediately after the commission of a crime is relevant to show consciousness of guilt. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1054–1055 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Vu, Aquino, and Diep arrived at Bui's house around 2:00 a.m. on Sunday, June 9, and slept there. On the afternoon of Sunday, June 9, Vu asked Khoi Nguyen to rent a motel room for him. Bui ultimately rented a motel room for Vu. This evidence was sufficient to warrant instructing the jury to determine whether Vu fled, and, if so, to determine the weight to accord such evidence of flight. (*People v. Bradford*, at p. 1055; see also CALJIC No. 2.52.)

In challenging the sufficiency of the evidence, Vu argues San and Bui were not credible witnesses and their accomplice testimony, induced by plea bargains, was unreliable. San's testimony was not inherently improbable, as Vu asserts. To the contrary, San provided a coherent and logical explanation of the events during the night of June 7, 2002. The prosecution's plea agreements with San and Bui were received in evidence. The court appropriately instructed the jury it may consider whether the witness was testifying under a grant of immunity in assessing credibility. (See *People v. Hampton* (1999) 73 Cal.App.4th 710, 722 [86 Cal.Rptr.2d 665].) Properly instructed, the jury alone decided the credibility and weight to be given San's and Bui's testimony. (*Ibid.*)

### III. The Trial Court's Responses to the Jury's Questions Were Not Erroneous, and Vu Fails to Show How Any of the Challenged Instructions Was Ambiguous.

Vu argues, "the trial court erred in addressing jury concerns regarding how to relate appellant's intent to that of coconspirators or persons aided and abetted . . . by references to instructions discussing the shooter's intent or the equal culpability of all principals and aiders and abettors." Vu asserts (1) the jury's questions indicated the jurors did not necessarily find the overt acts of the conspiracy as alleged and (2) the trial court's responses to those questions failed to clarify the standard instructions on conspiracy and aider and abettor liability. We find neither the instructions nor the court's answers to the jury's questions to be erroneous.

Vu's contention the jurors indicated they did not necessarily find the overt acts as alleged apparently is based on the following question: "Are the 4 overt acts [page] 65 of [the] jury instructions the only overt acts we can consider[?] In other words are we only limited to considering the 4 given overt acts[?] Can we consider other overt acts we believe the evidence supports[?]" The court gave this response: "1. *Count one* [¶] only the overt acts alleged can be considered as to the charge of conspiracy to commit murder [¶] 2. *Count two* [¶] as to the unalleged conspiracy to assault another with a firearm the jury can consider any overt act that the evidence supports." The trial court conferred with counsel about this response, and both agreed the response was "agreeable" and "satisfactory." Vu therefore waived any claim arising out of the trial court's response to that question. (*People v. Turner* (2004) 34 Cal.4th 406, 437 [20 Cal.Rptr.3d 182, 99 P.3d 505].)

We presume the jury followed the trial court's instruction. (*People v. Boyette* (2002) 29 Cal.4th 381, 436 [127 Cal.Rptr.2d 544, 58 P.3d 391].) The court's response to the jury made clear it could only consider the overt acts charged for the claim of conspiracy to commit murder. Since the jury found

Vu guilty on count 1, we can presume the jury found the overt acts as alleged. Vu offers no evidence to suggest otherwise.

Vu also asserts the jury "repeatedly asked how intents of the shooter and an aider and abettor or coconspirator related, and were referred again and again to principal instructions and conspiracy instructions referring to the intent of the shooter, or treating him and the abettor as equally guilty. This requires reversal for serious instructional error." Vu does not identify the jury questions or instructions to which he is referring. During deliberations, the jury submitted seven substantive questions (including the one quoted above) to the court. The court responded to each. Vu did not object to any of the responses. In fact, the record establishes the court reviewed each jury question with counsel and "the Court's responses were agreed upon by both parties." Vu therefore waived any claim arising out of the trial court's response to any of the jury's questions. (*People v. Turner, supra,* 34 Cal.4th at p. 437.)

The jury's questions related to the instructions on aiding and abetting (CALJIC No. 3.01), aider and abettor liability for natural and probable consequences of a principal's acts (CALJIC No. 3.02), first and second degree murder (CALJIC Nos. 8.20, 8.25, 8.30, 8.70), coconspirator liability (CALJIC Nos. 6.11, 6.20), and special circumstances intentional killing by an active street gang member (CALJIC Nos. 8.80.1, 8.81.15.1, 8.81.22). The court instructed the jury with the CALJIC instructions, modified somewhat to fit the facts of this case. Vu fails to explain how any of those standard instructions is erroneous or "unclear."

#### IV. *The Trial Court Should Have Stayed Imposition of Sentence on Counts 2 and 3.*

The trial court sentenced Vu under count 1 (conspiracy to commit murder) to a term of 25 years to life. Under count 2 (first degree murder), the court imposed a concurrent sentence of 25 years to life. Under count 3 (street terrorism), the court imposed a sentence of eight months, which is one-third of the midterm, to run consecutively to the sentence under count 1.

Vu contends the trial court erred by failing to stay imposition of his sentences under counts 2 and 3 pursuant to Penal Code section 654. Vu also asserts his sentence under count 3 should be modified to the two-year, midterm sentence.

The Attorney General concedes the trial court should have stayed imposition of sentence under count 2. (See *People v. Hernandez* (2003) 30 Cal.4th 835, 866 [134 Cal.Rptr.2d 602, 69 P.3d 446] ["Under [Penal Code] section

654, a defendant may not be punished for both the murder and the conspiracy"].) The Attorney General does not respond to Vu's assertion the sentence on count 3 must be modified upward to the two-year midterm. The Attorney General argues, however, the trial court was correct to impose sentence under count 3 because counts 1 and 3 involved different, independent criminal objectives.

■ Penal Code section 654, subdivision (a), reads in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 prohibits multiple sentences where a single act violates more than one statute, and where the defendant commits different acts that violate different statutes but the acts comprise an indivisible course of conduct with a single intent and objective. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19–20 [9 Cal.Rptr. 607, 357 P.2d 839] (*Neal*).) Under section 654, "[i]nsofar as only a single act is charged as the basis for the conviction . . . , the defendant can be punished only once." (*Neal*, at p. 19.)

The Attorney General argues Penal Code section 654 does not bar imposition of a separate sentence against Vu for street terrorism because his objective or intent for that crime was separate from his objective or intent for conspiracy to commit murder. Under the multiple and independent criminal objectives test, "if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*People v. Perez* (1979) 23 Cal.3d 545, 551 [153 Cal.Rptr. 40, 591 P.2d 63]; see also *People v. Latimer* (1993) 5 Cal.4th 1203, 1207–1212 [23 Cal.Rptr.2d 144, 858 P.2d 611].)

The multiple and independent criminal objectives test applies only to cases in which the defendant's conviction was based on an indivisible course of conduct. That test arose in reaction to *Neal*, which stated, "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of [Penal Code] section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal, supra,* 55 Cal.2d at p. 19, italics added.)

In *People v. Latimer, supra,* 5 Cal.4th 1203, the California Supreme Court criticized *Neal*, but reaffirmed it as established law. Notwithstanding *Neal*, "cases have sometimes found separate objectives when the objectives were

either (1) consecutive even if similar or (2) different even if simultaneous." (*People v. Britt* (2004) 32 Cal.4th 944, 952 [12 Cal.Rptr.3d 66, 87 P.3d 812].)

Citing *People v. Ferraez* (2003) 112 Cal.App.4th 925, 935 [5 Cal.Rptr.3d 640] (*Ferraez*), the Attorney General argues Vu entertained simultaneous but different objectives. In *Ferraez*, the defendant was convicted of one count of possession of cocaine base for sale and one count of street terrorism. The defendant claimed the trial court erred by failing to stay the sentence on the street terrorism conviction, arguing he had one intent and objective even though he committed two crimes. (*Id.* at p. 935.) A panel of this court affirmed, holding the defendant had simultaneous but independent objectives of possessing drugs with the intent to sell and of committing that felony to promote or assist the gang. (*Ibid.*)

The *Ferraez* court relied on *Herrera, supra,* 70 Cal.App.4th 1456. In *Herrera*, the defendant was charged with a course of criminal conduct involving two gang-related, drive-by shootings in which two people were injured. (*Id.* at pp. 1461, 1467.) The jury convicted the defendant of conspiracy to commit murder, two counts of attempted murder, and numerous other crimes including one count of street terrorism under Penal Code section 186.22, subdivision (a). (*Herrera,* at p. 1462.) A panel of this court, applying the multiple and independent criminal objectives test, held the defendant's conviction for street terrorism was divisible from the attempted murder convictions because the defendant had a different intent and objective as to each crime. (*Id.* at p. 1466.)

*Herrera* is distinguishable because the defendant was charged with a course of criminal conduct involving two gang-related, drive-by shootings in which two people were injured. (*Herrera, supra,* 70 Cal.App.4th at pp. 1461, 1467.) *Ferraez* is distinguishable because under the facts of that case, the trial court could have found independent objectives. (*Ferraez, supra,* 112 Cal.App.4th at p. 935.) That is not the situation here.

Under *Neal,* Vu committed different acts, violating more than one statute, but the acts of conspiracy and street terrorism constituted a criminal course of conduct with a single intent and objective. That single criminal intent or objective was to avenge Ly's killing by conspiring to commit murder. Although that intent or objective could be parsed further into intent to promote the gang and intent to kill, those intents were not independent. Each intent was dependent on, and incident to, the other. Because street terrorism prescribes a lesser sentence than conspiracy to commit murder, Penal Code section 654 prohibited imposition of sentence on count 3.

### Disposition

The judgment is modified to modify sentence on count 3 to a two-year term and to stay imposition of sentence under counts 2 and 3 pursuant to Penal Code section 654. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

Sills, P. J., and Aronson, J., concurred.

A petition for a rehearing was denied October 25, 2006, and appellant's petition for review by the Supreme Court was denied January 24, 2007, S147968. Moreno, J., did not participate therein.