Filed 9/11/14  P. v. Benson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C072978 |
| Plaintiff and Respondent, | (Super. Ct. No. SF117832A) |
| v. | |
| ANTIONE BENSON, | |
| Defendant and Appellant. | |

A jury found defendant Antione Benson guilty of conspiracy to commit robbery and (misdemeanor) possession of a concealed firearm and resisting a peace officer.  (Pen. Code, §§ 148, 182, subd. (a)(1)/211, former 12025, subd. (a)(2).)[1]

---

[1] Further undesignated statutory references are to the Penal Code.

1

Codefendants Patrick Smith and James Edward Ware were charged only with conspiracy to rob. Smith was acquitted; Ware was convicted, given probation and did not appeal.

The trial court suspended imposition of sentence and granted probation. Defendant timely appealed, contending insufficient evidence supports the conspiracy conviction. Disagreeing, we affirm.

## BACKGROUND

The People's theory was that defendant, together with Smith and Ware, planned to rob a pizza delivery driver at gunpoint, by ordering a pizza delivered to another person's house, while they lurked, armed, waiting to rob the driver.

Carl Almirol had worked as a delivery driver for two Stockton Domino's pizza parlors since 2008, and had been working at one on Charter Way since 2009. Domino's has a safety policy for their delivery employees, which included minimizing the cash carried, being careful with first-time customers by calling them to verify the order, and not delivering to certain locations at night due to risk of robbery. The store commonly received three "prank" orders per night, and about once per night Almirol returned with an undelivered pizza. Almirol had his own safety practices of parking in the middle of the street, personally calling the customer with his mobile telephone when he was near the delivery address, asking the customer to turn on a porch light, and not carrying a wallet.

On Sunday, June 26, 2011, Almirol was working the night shift. He was delivering three pizzas, two side orders, and two liters of soda pop to South Shasta Street. He called the number on the order before leaving the store and told the customer he would be there in 10-15 minutes. On the way, he tried calling the same number several times, but nobody answered. Immediately before he turned onto Shasta, he saw to his left "a guy wearing a [black or blue] hoodie sitting down" in the dark on one corner, and saw to his right another "guy" wearing a hoodie standing on the opposite corner.

2

Almirol became wary because he had seen no one else as he was heading toward the delivery address and it was odd that two men were outside at "11-ish" at night. He did not at first think he was necessarily going to be robbed, but thought they were going to run toward his car. He slowed at the delivery address, which was unlit. There were no cars in front, and the parking lot gate was closed. He called the customer's number again several times, left a message, called the store, and reported "looks like this is a set up and so I'm heading back." After he made a U-turn and drove away from the address, he saw three men together walking away. As he made a turn, he called the customer, and saw the man who had been standing on the corner earlier looking at his own mobile telephone; "I saw him waiting for a phone call, but he's not answering it. I just saw it lit up in there," and at the same time he saw something in the man's hoodie pocket and Almirol thought "it looks like it's a gun." He also saw the third man kneeling behind a car.

Almirol saw a patrol car, caught up to it, and reported his suspicions to the officer. Almirol followed the patrol car and tried to assist by using his own spotlight, when he saw one suspect run as the officers neared. When one officer held a suspect at gunpoint, Almirol called out that suspect was the man with the gun, but his hoodie was missing. He gave another officer the customer's telephone number. He saw that officer dial the number with the officer's own mobile telephone, and another mobile telephone in the officer's hand rang. He was sure that the three men next to the patrol car, before one ran off, were the three men he had seen before he flagged down the patrol car.

A resident at 839 South Shasta testified she and her boyfriend were both asleep when she was awakened by an officer that night, nobody at her house orders food for delivery, and she did not recognize any of the codefendants.

Stockton Police Sergeant Garlick testified he was on patrol with Officer Jeffery Pope when they saw three men walking on Anderson Street, and spoke with them while slowing down. Then Almirol arrived and reported "it's a setup and they just tried to rob

3

me." One of the three men then ran off, with Garlick in foot pursuit. The man (defendant) was wearing a red sweatshirt and had his hands in front of his waist as he ran, but by the time Garlick caught him, after briefly losing sight of him, the sweatshirt was gone. Almirol told Garlick defendant was the man who had the gun.

Officer Garlick then retraced the route of the chase, and by the house where he had briefly lost sight of defendant he found the red sweatshirt (a "hoodie") defendant had been wearing, which he had spotted on the ground during the chase, and he found a loaded 9-millimeter pistol in the gutter of the house, "directly above" where he found the sweatshirt. He saw no other people walking around in the area that night.

Officer Pope testified he had seen three men walking together, with no one else around. As the patrol car neared them, two split off and crossed the street. He pulled up to speak to the two on his side of the street (Smith and Ware), and noticed the third man (defendant) was about 20 feet behind the others. Then Almirol drove up and made his report of a suspected robbery attempt, whereupon Pope stopped the patrol care and both officers got out; Smith and Ware remained, but defendant fled, with Garlick in pursuit. When Pope dialed the number Almirol gave as the customer's number, Ware's mobile telephone registered the call.

**DISCUSSION**

Defendant contends there was insufficient evidence of a specific intent to commit robbery. He posits that "[t]he only reasonable conclusion to reach, after viewing the evidence, is that the entire incident grew out of [Almirol's] understandable but unfounded fear that he was once again being 'set up' to be robbed as he had been in the past."

We disagree with this benign view of the record. In determining whether substantial evidence supports a criminal conviction, "[w]e review the whole record in a light most favorable to the judgment to determine whether it contains substantial evidence, i.e., evidence that is credible and of solid value, from which a rational trier of fact could find beyond a reasonable doubt that the accused committed the offense." (*In*

4

*re Ryan D.* (2002) 100 Cal.App.4th 854, 859; see *People v. Barnes* (1986) 42 Cal.3d 284, 303-304.) "Evidence is sufficient to support a conviction only if . . . it ' "reasonably inspires confidence" ' . . . and is 'credible and of solid value.' " (*People v. Raley* (1992) 2 Cal.4th 870, 891.) We find such credible, solid, evidence here.

A conspiracy occurs when "two or more persons" agree "to commit any crime." (§ 182, subd. (a)(1).) " 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' [Citations.] 'Disagreement as to who the coconspirators were or who did an overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 120-121; see *People v. Vu* (2006) 143 Cal.App.4th 1009, 1024.) "A conspiracy can generally be established only by circumstantial evidence. It is not often that the direct fact of a common unlawful design can be proved other than by the establishment of independent facts bearing on such design." (*People v. Robinson* (1954) 43 Cal.2d 132, 136 (*Robinson*).)

Here the charge was conspiracy to commit robbery. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "The defining features of robbery are (1) the taking of property, (2) from a person, (3) accomplished by force or fear." (*In re Travis W.* (2003) 107 Cal.App.4th 368, 374.)

The evidence, viewed in the light favorable to the verdict, amply shows defendant carried the gun that was found in a gutter directly above his sweatshirt, discarded during his flight from the police, after Ware called in a phony order for pizza delivery, late at night, as the three men waited nearby to rob the driver. No one else was on the street

5

near the three men that night, according to the testimony, and Ware's mobile telephone had been used to place the pizza order. The delivery address was to a house whose occupants did not order out and its resident testified she and her boyfriend were asleep, and she did not recognize any of the codefendants. These facts give rise to the reasonable conclusion that defendant and Ware (if not also Smith) had agreed to rob the delivery driver, with Ware using his mobile telephone to lure the victim to the scene, and defendant was carrying a gun to facilitate the robbery.

Defendant's briefing relies on discrepancies in the evidence, or innocent inferences, but he fails to adhere to the proper standard of review. He challenges the strength of the evidence of each of the four overt acts, but each of these acts is supported by the evidence.[2]

As to the first overt act, defendant argues it "was based on murky evidence which, by the end of the case, remained in some doubt" and whether Ware's telephone was connected to the delivery order "was shaky and contradictory." But Almirol testified what number he called repeatedly, to complete the delivery, and when Ware was arrested, he was found with a telephone that responded when an officer dialed that number. That evidence supports the first overt act. As to the second overt act, defendant points to a discrepancy in Domino's records which showed an address of 925 South Shasta Street, whereas Almirol confirmed the address was 839 South Shasta. But such discrepancy does not vitiate Almirol's testimony, which supported the second overt act. Defendant concedes overt acts three and four are supported by the evidence.

Further, proof of an agreement for conspiracy liability is not limited to the four corners of the pleaded overt act or acts. "The overt act . . . need not amount to an attempt

---

[2] The four charged overt acts were (1) Ware ordered a pizza to be delivered, (2) the delivery was to be made to 839 South Shasta Street, (3) defendant was armed, and (4) all codefendants placed themselves on the street near the delivery address.

6

to commit the underlying offense." (1 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Elements, § 95, pp. 398-399.) "The purpose of statutes requiring an overt act is to allow an opportunity to repent and terminate the unlawful agreement before any decisive act is done in furtherance of it." (*Id*. at p. 398.) Indeed, the overt act or acts need not be criminal. (*Id*. at § 96, p. 400.) Instead, the jury must consider all of the circumstances shown by the evidence in determining whether a conspiracy was agreed. "It is well-settled that the unlawful agreement among conspirators may be inferred from the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties, the interests of the alleged conspirators and other circumstances." (*People v. Remiro* (1979) 89 Cal.App.3d 809, 843 (*Remiro*).)

Defendant asserts "there was no evidence of any prior association, or communication of any kind, between appellant and his co-defendants, nor evidence that they even knew each other. There was no evidence that any one of them had agreed with any other to commit any crime at any time, or any place." We disagree.

While there was no *direct* evidence of an agreement, such as an inculpatory admission, such evidence is rarely present in conspiracy cases, and circumstantial evidence suffices. (See *Robinson*, *supra*, 43 Cal.2d at p. 136; *Remiro*, *supra*, 89 Cal.App.3d at p. 843.) Ample circumstantial evidence exists in this case.

Defendant's claim amounts to little more than an invitation to this court to reweigh the evidence. We decline to do so. As outlined above, viewing the testimony in the light most favorable to the verdict, substantial evidence supports defendant's conviction.

**DISPOSITION**

The judgment is affirmed.


      DUARTE      , J.


We concur:


      RAYE      , P. J.


      BUTZ      , J.