Filed 10/9/15  P. v. Olmedo CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GUSTAVO BARRERA OLMEDO,<br><br>    Defendant and Appellant. | G049984<br><br>(Super. Ct. No. 10CF2532)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed as modified.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerard A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

INTRODUCTION

Gustavo Barrera Olmedo appeals from the judgment entered after a jury found him guilty of attempted premeditated murder and shooting at an occupied motor vehicle, in connection with a shooting incident that occurred on September 9, 2010 at Sigler Park in Westminster. The jury also found true enhancement allegations that Olmedo intentionally and personally discharged a firearm in the commission of the offenses and committed the offenses in furtherance of criminal street gang activity by the West Trece criminal street gang. Olmedo contends his convictions must be reversed "because the only evidence that he was the shooter—or even present at the shooting— came from admitted accomplices and no sufficient corroborating evidence connected [Olmedo] with the crimes." Olmedo also argues he is entitled to three additional days of presentence custody credits.

We affirm. We conclude independent evidence reasonably tending to connect Olmedo to the commission of the charged offenses as the gunman corroborated the accomplices' testimony. That independent evidence included gang expert witness testimony and the victim's testimony establishing Olmedo's motive, Olmedo's testimony establishing opportunity, eyewitness testimony describing the shooter coupled with a booking photograph of Olmedo, taken a few days after the shooting, and evidence of false or misleading statements that Olmedo made to the police officers who were investigating the shooting. As was the case in *People v. Vu* (2006) 143 Cal.App.4th 1009, 1013, "[t]he corroboration evidence was at least as strong as that found by the California Supreme Court in *People v. Szeto* (1981) 29 Cal.3d 20 . . . to be sufficient to corroborate the accomplice testimony."

As to Olmedo's presentence custody credits argument, the Attorney General concedes that Olmedo is entitled to three additional days of presentence custody credits. We will direct the trial court to modify the judgment accordingly.

2

I.

NONACCOMPLICE EVIDENCE OF GUILT

West Trece (West) is a "well-documented" criminal street gang in the City of Westminster. Sigler Park is located within West's claimed territory and is its members' "primary hang out or gathering point." Members and affiliates of West particularly congregate near the handball courts at Sigler Park. A gang expert witness testified that in his opinion based on his investigation, both Olmedo and Guadalupe Cuevas were members of West. (Cuevas admitted to being an active participant in West in his guilty plea.)[2]

Orphans is a Hispanic criminal street gang that is one of West's rivals. On September 9, 2010, Enrique Zacatenco, who was a member of Orphans, started drinking alcohol around 3:00 p.m. By 5:30 p.m., he had consumed "like, an 18 pack" of beer and was "a little tipsy." Around 6:30 p.m., he was driving his black Toyota Camry in the area of Sigler Park and became bored so he decided to drive around Sigler Park to "see what was going on."

Zacatenco knew Sigler Park was inside West's claimed territory and that was where West's members would often hang out; he had seen them there. He also knew it is "disrespectful" for a gang member to go inside a rival gang's claimed territory, and, if a member does so and causes trouble, the member will "[p]robably get dealt with." Zacatenco testified that such a disrespectful act could result in violence in the form of a

---

[1] We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

[2] As discussed *post*, the trial court instructed the jury that Cuevas was an accomplice in the commission of the charged offenses.

beating, stabbing, or shooting. He explained that if a member's gang is disrespected, and the member fails to retaliate for the disrespectful act, it is a problem "[b]ecause you should be doing something about it" and "you're going to lose power." On the other hand, causing trouble and committing crimes gain the perpetrator more recognition within his or her own gang as it proves "you know, like you can hang."

When Zacatenco went into Sigler Park, he saw five or six "people from West." After Zacatenco drove around in the park three times, "they thr[e]w up West Trece," meaning they yelled out their gang name. Zacatenco said he did not know why, but he "threw out [his] neighborhood" by yelling back "Orphans," and "[t]hat's what started it." He said he knew his conduct might cause trouble and claimed he then tried to leave.

Zacatenco said "they" started running toward his car and he accelerated. He said, "they threw some objects at [his] car," which shattered his windshield, and he ducked down. He looked out the driver's side window and saw a male pointing a gun at him; he did not see the gunman's face. Zacatenco accelerated his car and heard shots. He saw a brown-colored minivan speed away.

Later that night, Zacatenco was pulled over by the police for driving under the influence. A police officer observed two bullet entry holes on the driver's side doorframe of the Camry and that the rear passenger window was shattered or broken.

On September 9, 2010, Tammy Vo, who lived near Sigler Park, was driving home when she saw a man, standing outside of a brown-colored minivan on the passenger side, holding a black gun, and aiming at a black Camry. She heard at least three shots and saw the driver of the Camry drive away; she also saw the shooter run into the minivan and the minivan drive away.

Vo did not see the shooter's face but she described him as Hispanic and having a medium to a "little heavy build" and five feet seven inches to five feet 11 inches tall; she also described him as "thick," "[a] little chubby," and "kind of heavy," weighing

4

maybe 165 to 180 pounds. Vo said the shooter had thick hair. She said the front seat passenger in the minivan had much thinner hair than the shooter. A booking photograph, taken of Olmedo on September 16, 2010, depicted a male with facial hair and short, curly hair. A copy of the booking photograph was admitted into evidence. (Olmedo testified that at the time he was arrested, he was six feet one inch tall and weighed 320 pounds, but he "wasn't too sure.")

Detective Andrew Stowers of the Westminster Police Department interviewed Peter Peck[3] and learned from him that Olmedo was not only involved in the shooting, but the gunman. Stowers set up a recording device on Peck's phone and had Peck call Olmedo. A male answered the phone, and Peck told him that he (Peck) was in trouble as the police had come to his house and had identified him (Peck) as involved in the shooting at Sigler Park. Peck also told the male that he too had been identified. The male responded by telling Peck to "get off the phone" and "don't talk on the phone," then said goodbye.

On September 15, 2010, Olmedo was arrested in Victorville. On September 16, Officer William Drinnin of the Westminster Police Department interviewed Olmedo. Olmedo told Drinnin that before the shooting occurred, he was dropped off at Sigler Park by Peck and Cuevas; Peck was driving a minivan. Olmedo told Drinnin he was going to the park to meet some friends; he was evasive about the identity of the friends whom he was meeting. He told Drinnin that he was walking through the park when he heard gunshots. Olmedo refused to answer some of Drinnin's questions. He admitted knowing several people from West and knowing Cuevas.

---

[3] As discussed *post*, the trial court instructed the jury that Peck was an accomplice in the commission of the charged offenses.

## II.

### ACCOMPLICE TESTIMONY

The trial court instructed the jury that Peck and Cuevas were accomplices to the crimes of attempted murder, shooting at an occupied motor vehicle, and negligent discharge of a firearm (the lesser included offense of shooting at an occupied motor vehicle). Peck entered into a plea deal in which he pleaded guilty to "certain charges," including aiding and abetting shooting at an occupied motor vehicle and admitting the gang enhancement attached to that offense. Cuevas also entered into a negotiated plea agreement that included his pleading guilty to aiding and abetting an assault with a firearm and active participation in a criminal street gang.

### A.

### *Peck's Testimony*

Peck testified that about a year before the shooting incident, he had met Olmedo through an acquaintance for the purpose of purchasing marijuana from Olmedo. "After a while," he and Olmedo would often hang out, smoke marijuana, and rap to music. He got to know Cuevas through Olmedo and the three of them hung out "quite a bit."

In September 2010, Peck was living at his fiancée's apartment near Sigler Park; Olmedo and Cuevas lived nearby. Peck came to suspect Olmedo and Cuevas were affiliated with a criminal street gang. Shortly after a West affiliate got out of juvenile hall, Olmedo's and Cuevas's demeanor changed. They used to hang out and party, but after the West affiliate "came out," Olmedo became "more hardcore, . . . an enforcer-type." Olmedo's "talking" changed from "let's hang-out" to "we've taken care of this guy" and to discussing violent things. Peck became uncomfortable, but felt he could not suddenly cut ties with Olmedo and Cuevas because it "puts up red flags." Peck

6

planned to buy one last bag of marijuana from Olmedo and tell him it was the last time because he could not afford it anymore; they would therefore no longer have a reason to hang out together.

On September 9, 2010, Peck called Olmedo to buy some marijuana. Around 10:30 a.m. or 11:00 a.m., Olmedo brought some marijuana to Peck's apartment and Olmedo, Peck, and Cuevas smoked marijuana together.

Peck's neighbor asked Peck if he could drive to the smoke shop to buy cigarettes for her. He agreed to do that, but told her he needed money for gas. She gave him gas money. Peck, Cuevas, and Olmedo went to a gas station. Peck drove a tan-colored minivan; Cuevas sat in the front passenger seat and Olmedo sat in the backseat.

Olmedo received a phone call; he spoke on the phone in Spanish for about a minute. He said he needed to go to Sigler Park to collect some money. Peck drove to Sigler Park, and dropped off Olmedo and Cuevas. Peck parked. A minute or two later, they got back into the minivan. Olmedo asked for a ride to his house. Peck drove to Olmedo's house. Olmedo went inside the house while Cuevas stayed in the minivan. After several minutes, Olmedo came out of the house, and got into the minivan. He asked Peck to take him back to Sigler Park; Olmedo was not carrying anything and did not volunteer why he needed to return to Sigler Park.

Peck backtracked to Sigler Park. At a stop sign, a black car almost hit the front end of the minivan. Olmedo and Cuevas got out of the minivan. Olmedo had a black revolver in his hand, which he pointed at the black car. Peck heard at least six gunshots. When the gunshots stopped, Peck opened his eyes and stepped on the gas to get out of there. After Peck saw Cuevas trying to get into the minivan, he slowed down to let Cuevas get in, and then drove back to his apartment.

Cuevas told Peck that he did not "need to be saying anything about this" and that Cuevas knew "what happens to people that say stuff about this." He also asked

7

Peck where he could "stash some weed" and Peck testified that he said, "there was my van or he can put it in with my cans or whatever."[4]

About 15 to 20 minutes later, Olmedo showed up at Peck's apartment. He said that he was sorry and had to take care of business. He thereafter acted as if nothing had happened; Cuevas was also "hanging out like if nothing happened."

Peck learned the gun had been hidden "within [his] cans." When he found out the gun had been hidden there, Peck told Cuevas he had a family, "[t]his ain't cool," and "[t]his ain't working." Olmedo told Peck, "[s]hut up. If it gets found, somebody will go down for it. It will be out of here by tomorrow." Before Olmedo left, he told Peck that "if the police do show up, [to] know that [Peck was] not supposed to say anything." Olmedo also said, "[t]ell them whatever" and "[n]ot to talk about this on the phone or anything like that or in text or anything."

The following day, Peck was informed by an unidentified source not to worry because the gun had been "taken care of" and had been sold.

On September 14, 2010, police detectives came to Peck's apartment. Initially, Peck lied to them, but eventually told the detectives that Olmedo was the shooter. The detectives asked him to call Olmedo, while they listened. Peck called Olmedo, and told him that the police had just been at his house. Olmedo asked, "for what?" and Peck said, "for the incident at the park." Olmedo told Peck, "I told you not to discuss that on the phone," and hung up.

B.

*Cuevas's Testimony*

Cuevas's account of the events of the evening of September 9, 2010, largely agreed with Peck's account. Cuevas testified that he had met Olmedo earlier in

---

[4] The record does not explain what Peck meant in using the word "cans."

2010 and, at some point, smoked marijuana almost daily with Olmedo and Peck. Cuevas had several family members who were affiliated with West, although Cuevas denied being a member or active participant in West himself. He saw Olmedo hanging out with "people from West." He knew Olmedo would "back up" members of West, meaning he would help them whenever they needed help. At some point before September 9, 2010, Olmedo told Cuevas he had purchased a gun.

Like Peck, Cuevas testified that on September 9, 2010, he, Peck, and Olmedo were hanging out at Peck's apartment before they left to go to a gas station in Peck's tan minivan. While driving away from the gas station, Olmedo received a phone call and had a conversation in Spanish. Olmedo thereafter asked Peck to take him to his (Olmedo's) house. When they got to the house, Olmedo went inside for a minute. When he returned to the minivan, he was not carrying anything, and asked to be taken to Sigler Park and appeared to be in hurry. Cuevas asked Olmedo why, and Olmedo told him, "[n]ot to worry about it."

As Peck drove the short distance back to Sigler Park, Cuevas felt something bad was going to happen. When they got there, Olmedo got out of the minivan. Cuevas stepped one foot out of the minivan. Olmedo drew a firearm, pointed it toward a black car, and fired four or five shots. Peck started to drive away and Cuevas got back into the minivan. Olmedo did not get back into the minivan.

Peck drove back to his apartment. Olmedo showed up at the apartment minutes later. Cuevas believed the gun was hidden outside the apartment.

At an unspecified later time, Olmedo told Cuevas he had sold the gun. Cuevas also learned that the person inside the black car might have been a member of Orphans. At the time he was booked, Cuevas was five feet 11 inches tall and weighed 200 pounds. Cuevas told a police detective that he knew Olmedo had a firearm.

9

III.

OLMEDO'S TESTIMONY

Olmedo testified in his defense. In September 2010, he both smoked marijuana daily and sold it on a daily basis along with Cuevas and Peck. He engaged in drug sales at Sigler Park. He knew Cuevas was a participant in West, but did not know whether he was a member. Olmedo denied being a member of West or actively participating in its activities.

On September 9, 2010, Olmedo was with Cuevas and Peck at Peck's residence. They left the residence to deliver a sack of marijuana at a local restaurant and stopped at a gas station. En route, Olmedo received a telephone call from Cuevas's uncle. He wanted to buy marijuana and have it delivered at the handball courts at Sigler Park. Olmedo did not have the marijuana on hand so Peck drove Olmedo and Cuevas to Olmedo's residence to get it. Olmedo denied picking up a gun, owning a gun, ever shooting a gun at a car or a person, or telling Cuevas that he had a gun.

When Olmedo got back into the minivan, he sat in the backseat and Cuevas sat in the front passenger seat. Olmedo told Peck to drive him to the handball courts at Sigler Park. Peck dropped him off short of reaching the park because Olmedo thought Cuevas's uncle would be angry if he and Cuevas were together.

Olmedo walked to the park, met Cuevas's uncle at the handball courts, and sold the marijuana to him. As Olmedo was walking away, he heard gunshots. He was scared and ran through the park. He saw his friend's mother looking for her son and she offered Olmedo a ride; he accepted.

Olmedo went back to his residence that day. He went to Peck's residence two times after the shooting, but he denied ever threatening Peck, or telling Peck not to talk to the police. Olmedo testified that he later went to Victorville because his fiancée wanted him to get away from drug use as it was bad for his child. Olmedo stated that at

10

the time he was arrested, he was "roughly" 320 pounds and six feet one inch tall, but he "wasn't too sure."

## BACKGROUND

Olmedo was charged in an information with one count of attempted murder in violation of Penal Code sections 664, subdivision (a) and 187, subdivision (a); the information alleged that the attempted murder offense "was committed willfully, deliberately and with premeditation within the meaning of Penal Code Section 664(a)." Olmedo was also charged with one count of shooting at an occupied motor vehicle in violation of Penal Code section 246 and one count of carrying a loaded unregistered firearm in public in violation of former Penal Code section 12031, subdivision (a)(1) and (2)(F).

As to all counts alleged against Olmedo, the information asserted those offenses were committed "for the benefit of, at the direction of, and in association with West Trece, a criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by members of that gang." (Some capitalization omitted.) As to the attempted murder offense, the information alleged that, pursuant to Penal Code section 12022.53, subdivision (c), and within the meaning of Penal Code sections 1192.7 and 667.5, Olmedo intentionally and personally discharged a firearm during the commission and attempted commission of that offense. As to the count of shooting at an occupied motor vehicle, the information alleged, pursuant to Penal Code section 12022.5, subdivision (a), and within the meaning of sections 1192.7 and 667.5, that Olmedo personally used a firearm in the commission and attempted commission of that offense.

The trial court dismissed the offense of carrying a loaded unregistered firearm in public after granting the prosecution's motion to dismiss it.

The jury found Olmedo guilty of attempted premeditated murder and shooting at an occupied motor vehicle. The jury found true all enhancement allegations as to those offenses.

11

The trial court sentenced Olmedo to a total prison term of 35 years to life. Olmedo appealed.

DISCUSSION

I.

INDEPENDENT EVIDENCE CORROBORATED THE ACCOMPLICES' TESTIMONY CONNECTING OLMEDO TO THE COMMISSION OF THE CHARGED OFFENSES AND THE TRUTH OF THE ATTENDANT ENHANCEMENT ALLEGATIONS.

Olmedo argues the prosecution presented insufficient evidence to corroborate the testimony of Peck and Cuevas, who, as the trial court instructed the jury, were accomplices to the commission of the charged offenses, within the meaning of Penal Code section 1111.[5] Olmedo's argument lacks merit.

Penal Code section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

In *People v. Williams* (2013) 56 Cal.4th 630, 678-679, the California Supreme Court explained: "The law on the corroboration of accomplice testimony is well established: '"The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been

_____

[5] The jury was given CALCRIM No. 335 and thereby instructed that Peck and Cuevas were accomplices to the charged offenses and that the jury could not convict Olmedo of the charged offenses or find true any attendant enhancement allegation, based on an accomplice's statement or testimony unless (1) such statement or testimony was supported by other independent evidence that the jury believed (2) which evidence tended to connect Olmedo to the commission of the charged offenses. Olmedo does not argue on appeal that there was any instructional error at trial.

admitted or does not reasonably tend to connect the defendant with the commission of the crime."' [Citation.] '"The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime."' [Citation.] 'The evidence is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth."' [Citation.]"

Olmedo does not contend any of the corroborating evidence was inadmissible. Furthermore, the corroborating evidence reasonably tended to connect Olmedo with the commission of the charged offenses and the truth of the attendant enhancement allegations. Evidence independent of the accomplices' statements or testimony established Olmedo's motive and opportunity to commit the charged offenses by showing Olmedo was present at the scene of the shooting involving a rival gang member disrespecting Olmedo's gang. A gang expert's testimony showed that on the day of the shooting, Olmedo was a West member and was in the company of Peck and Cuevas, who, the gang expert opined, was also a West member. Zacatenco testified that on the day of the shooting, he was a member of Orphans, which is a rival of West, and drove around Sigler Park—a place within West's claimed territory, which he knew to be a main gathering place for West members. Zacatenco testified that he, inter alia, yelled out "Orphans" at "people from West," acknowledging that such a provocative move would likely result in some form of retaliation that might include being shot. Olmedo testified that shortly before the shooting, he received a phone call and then had Peck drive him home before he directed Peck to drive him to Sigler Park. Olmedo admitted being at Sigler Park at the time of the shooting. (*People v. Vu*, *supra*, 143 Cal.App.4th at p. 1022 ["A defendant's own testimony may be sufficient corroborative testimony."].)

13

In addition, independent evidence in the form of eyewitness testimony was sufficient to corroborate the accomplices' testimony that Olmedo not only committed the charged offenses, he was the gunman. Olmedo admitted that he was driven to Sigler Park by Peck in Peck's brown minivan. Vo testified she saw a brown minivan near a black Camry and that inside the minivan, there was a driver and a front seat passenger. She also saw a man standing outside the minivan, aiming a gun at the Camry before firing several times. (Zacatenco testified he was driving a black Camry that evening.) Vo described the appearance of the gunman as, inter alia, having short, thick hair and being "chubby." A booking photograph, taken of Olmedo about a week after the shooting, was shown to the jury and admitted into evidence. Thus, the jury was in the position to compare Vo's description of the gunman, the accomplices, and Olmedo's booking photograph.

Additional independent evidence supported the finding that Olmedo gave false or misleading statements about the shooting. (*People v. Vu*, *supra*, 143 Cal.App.4th at p. 1022 [a defendant's "false or misleading statements made to authorities may constitute corroborating evidence"].) In a police interview, Olmedo denied receiving any call while riding in Peck's minivan on September 9, 2010. At trial, Olmedo testified that he had received a call at that time from Cuevas's uncle to purchase some marijuana from Olmedo and deliver it at Sigler Park. Drinnin testified that in an interview of Olmedo regarding the shooting, Olmedo was evasive and refused to answer some questions.

The corroborating evidence here was at least as strong as that held to be sufficient in *People v. Szeto* (1981) 29 Cal.3d 20. In *People v. Szeto*, members of an Asian street gang sought revenge against a rival gang by firing guns into a crowded restaurant where rival gang members were believed to be eating. (*Id.* at p. 26.) Several bystanders were killed. (*Ibid.*) The defendant was convicted of being an accessory to a felon for his role in disposing of the weapons. (*Ibid.*) An accomplice testified that on the morning after the shooting spree, the defendant brought the killers food, placed the guns

14

in his car, drove to a spot along San Francisco Bay, and threw the guns in the water. (*Id.* at p. 27.)

In *People v. Szeto*, corroborating testimony evidence established (1) the defendant was a member of the Joe Boys gang; (2) Joe Boys was a rival of the Wah Ching and Hop Sing gangs, and the rivalry had erupted into warfare; (3) Wah Ching and Hop Sing gang members had killed a Joe Boys gang member; (4) the defendant attended the funeral of the fellow gang member killed by the rival gangs; (5) on the morning after the restaurant killings, the defendant brought food to the house where the killers were staying; and (6) the guns used the previous night were inside the house when the defendant brought the food. (*People v. Szeto*, *supra*, 29 Cal.3d at p. 28.) The California Supreme Court held this testimony established the defendant had a motive and the opportunity to aid the killers and therefore was sufficient corroboration of the accomplice testimony. (*Ibid.*)

## II.

### OLMEDO'S PRESENTENCE CUSTODY CREDITS SHOULD BE INCREASED.

Olmedo argues his presentence custody credits should be increased by three days. At sentencing, he was awarded 1,496 days of custody credit consisting of 1,301 actual days plus 195 days of conduct credit pursuant to Penal Code section 2933.1. Olmedo, however, had served 1,304 actual days in presentence custody, not 1,301 days, as he was arrested on September 16, 2010, and was sentenced on April 11, 2014.

In the respondent's brief, the Attorney General agrees that Olmedo had served 1,304 actual days in presentence custody and that the abstract of judgment should be corrected accordingly. As Olmedo is entitled to 1,304 days of credit for actual time served, and to 195 days of good time/worktime credit, we direct the trial court to correct the abstract of judgment to reflect the correct number of days of presentence custody credits to which Olmedo is entitled. (See *People v. Magallanes* (2009) 173 Cal.App.4th 529, 537.)

15

## DISPOSITION

We direct the trial court to modify the judgment to credit Olmedo with a total of 1,499 days of presentence custody credits, prepare an amended abstract of judgment, and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.

16