Filed 7/2/25  P. v. Flores CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B330360 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA055632) |
| v. | |
| FIDEL FLORES, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tammy Chung Ryu, Judge.  Affirmed.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.

—————————————

In 2000 a jury convicted Fidel Flores, Jr., of second degree murder. In 2021 Flores petitioned for resentencing under Penal Code former section 1170.95 (now section 1172.6).[1] Following briefing and an evidentiary hearing, at which Flores testified, the superior court denied the petition, finding the People proved beyond a reasonable doubt that Flores was guilty of aiding and abetting second degree murder under an implied malice theory.

Flores contends the superior court erred by finding the testimony at trial of Flores's codefendant, Abel Alexander Torres, was more credible than Flores's testimony at the evidentiary hearing, and further, substantial evidence did not support the court's finding Flores possessed the requisite intent for second degree murder. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Evidence at Trial*

On September 23, 1999 Flores was at home painting his car with the help of Torres.[2] Flores, who was 17 years old at the time, later admitted to a police officer that he was an active member of the Locos 13 gang. Torres was also 17 years old and was a former member of the Compton 124 gang. The men did not know each other well; they had been recently introduced by a mutual friend who knew that Torres would be able to help Flores

---

[1]     Further statutory references are to the Penal Code.

[2]     Flores did not testify at trial, but portions of his post-arrest statements to police officers were described or read to the jury by one of the detectives who interviewed him. (*People v. Flores* (May 13, 2002, B149691) [nonpub. opn.] (*Flores I*).)

2

paint his car.  (*People v. Flores* (May 13, 2002, B149691) [nonpub. opn.] (*Flores I*).)

At some point in the afternoon, Flores and Torres left to buy additional painting supplies.  Flores was driving, and Torres was in the passenger seat.  On the way to the store, they decided to drive by the local high school to "check out" the girls who were getting out of school around that time.  When they approached the intersection of Bullis Road and Lolita Street they saw a group of young men standing near the road.  The men were staring at Flores and Torres and "throwing gang signs" at them.  Jorge Alvaro, who was watching this confrontation from the doorway of his mother's house across the street, testified he saw the group outside the car "flipping off" Flores and Torres.  Flores "was flipping them off" and Torres was "throwing out some other kind of signs."  Torres believed at least one of the men had a gun, and he told Flores they should leave.  (*Flores I, supra,* B149691.)

Flores told the detective that, after leaving the scene of the confrontation, he drove to the paint supply store.  He said the first store he went to did not have the correct supplies, so he went to a second store to make the purchase.   Torres, by contrast, testified Flores drove back to his house without purchasing the paint supplies.  Flores's house was approximately 1.1 miles from where the confrontation took place.  According to Torres, when they arrived at Flores's house, Flores went inside for approximately five minutes while Torres waited outside.  When Flores returned, he got into the car and said, "Let's go blast," which Torres understood meant "to go shoot."  Flores handed an automatic pistol to Torres and told him to "Glock it."  Torres understood that meant to place a bullet in the chamber, which he did.  (*Flores I, supra,* B149691.)

3

Flores drove back to the intersection of Bullis Road and Lolita Street, with Torres in the front passenger seat. They arrived at the site of the confrontation approximately 15 to 20 minutes after the initial encounter. As they approached the area where they had seen the young men, Torres took the safety off the gun and cocked the hammer back so it was ready to fire. Torres testified Flores pulled the car over to the curb and stopped. However, Flores later told detectives he had not pulled over, but rather, he had been forced to stop due to vehicle traffic and pedestrians walking in front of the car.[3] There were three or four young men standing near the car, and one of them was "maddogging" (looking offensively) at Flores and Torres. (*Flores I, supra,* B149691.)

Alvaro testified he was outside his house at this point, and the group of three men were now standing on the same side of the street as Alvaro's house. Alvaro stood near where Flores stopped the car. Alvaro approached the car and heard Torres ask the group, "Where you guys from?" Alvaro replied, "This is Lynwood," and Torres said he was "Compton 124." The men went back and forth like this approximately three times, at which point Torres had an angry look on his face and pulled out a gun. Alvaro tried to slap the gun out of Torres's hand and then turned to run inside. The gun did not fire when Alvaro slapped it, but Alvaro heard three or four gun shots a few seconds later as he ran away. (*Flores I, supra,* B149691.)

---

[3]     One eyewitness testified there was a lot of traffic at the time because the students were getting out of school. Alvaro testified traffic was moving on the street and Flores appeared to purposefully pull over and stop the car.

Torres provided a different version of the shooting. He testified that when Alvaro approached the car, Flores tapped Torres on the leg and told him to "blast him." (5 Aug 637)~ After the men stated their gang affiliations, Alvaro took a step back from the car and lifted his shirt, exposing the handle of a gun. Torres panicked and extended the gun out of the car window. When Alvaro slapped at the gun, it went off accidentally three or four times. Torres did not intend to fire the gun. Flores drove off immediately. (*Flores I, supra,* B149691.)

Alvaro's brother Fernando Alvaro had been standing near the car. He was shot in the neck and later died from the gunshot wound. He had been standing less than four feet from the car when he was shot. (*Flores I, supra,* B149691.)

Flores drove Torres home, and Torres hid the gun in the bushes near his house. When he later tried to retrieve the gun, it was gone. Flores sold his car a few days after the shooting. Flores initially told detectives that he did not know there was a gun in the car, but upon further questioning, he admitted he knew the gun was there. (*Flores I, supra,* B149691.)

B.     *The Jury Verdict and First Appeal*

The jury found Flores and Torres guilty of second degree murder (§§ 187, 189) and found true the allegation that Torres personally discharged a firearm during the commission of the murder (§§ 12022.5, subd. (a)(1), 12022.53, subds. (b), (c), (d) & (e)(1)). The jury found true as to Flores (but was unable to reach a verdict on the allegation as to Torres) that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). (*Flores I, supra,* B149691.) The trial court sentenced Flores to 16 years to life in state prison, comprising 15 years to life on the murder count, plus one year for the firearm

enhancement. The court granted Flores's motion to dismiss the finding on the gang enhancement allegation.

We affirmed Flores's conviction on appeal but reversed the trial court's dismissal of the true finding on the gang enhancement and ordered the court to reinstate the finding.[4] (*Flores I, supra,* B149691.) On remand for resentencing, the court sentenced Flores to 40 years to life in state prison.

C.      *The Petition for Resentencing and Evidentiary Hearing*

On December 15, 2021 Flores filed a petition for resentencing, requesting the superior court vacate his murder conviction and resentence him in accordance with recent statutory changes relating to felony murder and the natural and probable consequences doctrine. In his petition, Flores declared he was "not the actual killer," and the prosecution could have proceeded on the natural and probable consequences theory of liability. Further, he "could not now be convicted of murder due to the changes made to Penal Code sections 188 and 189, effective January 1, 2019." Flores further stated he did not act with the intent to kill, was not a major participant in the underlying felony, and did not act with reckless indifference to human life. Flores requested appointment of counsel. After appointing counsel and receiving memoranda from the parties, the superior

---

[4]      We reversed Torres's conviction based on the trial court's failure to instruct the jury on involuntary manslaughter and remanded to allow the prosecution to retry Torres or, if the prosecution did not request a new trial, for the court to resentence Torres for involuntary manslaughter. (*Flores I, supra,* B149691.) On remand Torres pleaded guilty to second degree murder and was sentenced to 15 years to life.

court issued an order to show cause and held an evidentiary hearing on April 11, 2023.

The prosecutor submitted the transcripts from the trial. Flores testified at the hearing that he was a member of a gang at the time, but he was not "full throttle" with the gang, and instead was "one step in, one step out." He agreed to have Torres help him work on his car because he understood Torres was no longer active in a gang. But Flores "kind of believed" Torres had a gun on him because Torres used to be a gang member.

Flores recounted that at around 2:30 in the afternoon he and Torres left his house to buy paint supplies. On the way to the store, they drove by the high school, "cruising" to "pick up some girls." When they got to the intersection of Bullis and Le Sage they saw "a few kids . . . throwing up gang signs and flipping us off." Flores and Torres started "maddogging" the kids and "flipping them off." Flores kept driving. Flores assumed Torres had a gun because Torres "used to have one" as a member of a gang.

Flores denied going back to his house after the first encounter. He said he drove around the high school before circling back to the area of the confrontation. The route around the high school took approximately 15 minutes because of traffic from the students getting out of school. When he arrived at the initial location on Bullis Road, he saw the same group of young men he had seen previously. They were across the street from where they were before, and they walked in front of his car. Flores pulled over slightly toward the curb and stopped to avoid hitting them. Alvaro leaned against the car and started "talking smack." Alvaro asked, "Where you guys from?" Torres replied, "I'm from Compton," to which Alvaro responded, "You're in my

neighborhood. This is Lynwood Dukes." A member of the group started to untuck his shirt, which made Flores think he had a gun. At that point, Torres reached down and pulled out a gun. Alvaro tried to grab the gun, and it went off. Flores panicked and drove away.

Flores acknowledged in cross-examination that the Lynwood Dukes was a rival of Locals Trece, Flores's gang, and the high school was in the Lynwood Dukes' territory. Flores acknowledged that at the time of the incident he had a gun "for sort of [a] gang purpose." Further, the young men during the confrontation claimed to be members of Lynwood Dukes, and Torres claimed membership in Compton 124. The exchange of gang affiliations was typical in gang confrontations. But Flores denied giving Torres the gun and telling him they were going to "blast."

Flores called Dr. Megan Williamson, a clinical psychologist who had conducted a three-hour interview with Flores. Dr. Williamson explained that the prefrontal cortex—the portion of the brain responsible for impulse control and complex planning—does not fully develop until a person is 25 or 26 years old. In response to a hypothetical based on the facts of the case, Dr. Williamson opined it was "entirely possible" that a 17-year-old's "fight or flight" instincts would take over, causing "impairments in his ability to think clearly, think about long term consequences, think about his actions."

After the close of testimony, the prosecutor argued the evidence presented during the trial and at the hearing supported a finding that Flores was guilty of second degree implied malice murder as an aider and abettor. Flores's counsel argued Flores did not know Torres was armed until he saw the gun during the

confrontation and, therefore, Flores could not have had the requisite intent to support a conviction for implied malice murder. Flores's attorney argued in the alternative that Flores acted in imperfect self-defense, which negated any malice.

After taking the matter under submission, the superior court denied Flores's petition for resentencing, finding Flores "did possess the malice required in this case as an aider and abettor. He supplied the weapon. He knew what was going to happen. He supported Mr. Torres going back there with a gun. And he stopped the car. He pulled over and allowed Mr. Torres to engage in the shooting. So he clearly intended to and did aid the shooting in this case."[5] The court explained it had reviewed the transcripts from the trial and found Torres's account of the shooting to be more credible than Flores's account. Specifically, the court did not find credible Flores's testimony that he did not provide the gun or tell Torres to blast the men. The court noted several inconsistencies in Flores's testimony, including that he claimed to believe Torres was not a gang member, yet he presumed Torres had a gun because he had been a gang member. In addition, Flores claimed he was forced to pull over because of traffic. But Alvaro testified there was no traffic, and Flores was able to pull away from the curb and flee after the shooting without being blocked by traffic. The court also found it was unlikely that Torres had influenced Flores with respect to the shooting given that Flores was almost a year older. Further, the court stated it had considered Flores's young age in reaching its decision. Finally, the court stated that it did not believe Flores

---

[5] The superior court did not reference the evidentiary burden in its pronouncement of the ruling. However, the minute order stated the court found Flores guilty "beyond a reasonable doubt."

9

was controlled by a fight or flight response (as described by the psychologist) because Flores was able to flee from the initial confrontation but chose to return after 15 minutes.

Flores timely appealed.

## DISCUSSION

A.     *Senate Bill No. 1437 and Section 1172.6*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), effective as of January 1, 2019, eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule.  (*People v. Patton* (2025) 17 Cal.5th 549,558; *People v. Curiel* (2023) 15 Cal.5th 433, 448-449 (*Curiel*); *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).) Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a defendant of murder, except under the revised felony-murder rule as set forth in section 189, subdivision (e).  (*Patton*, at p. 558; *Curiel*, at p. 448.)

Senate Bill No. 775 (2021-2022 Reg. Sess.), effective January 1, 2022, expanded the scope of potential relief by applying Senate Bill 1437's ameliorative changes to individuals convicted of attempted murder and voluntary manslaughter. (See § 1172.6, subd. (a).)  The legislation also extended relief to defendants convicted of murder under any "'other theory under which malice is imputed to a person based solely on that person's participation in a crime.'"  (§ 1172.6, subd. (a), as amended by Stats. 2021, ch. 551, § 2; see *People v. Antonelli* (2025) 17 Cal.5th 719, 725.)

Section 1172.6 provides a procedure for an individual convicted of felony murder, murder or attempted murder under the natural and probable consequences doctrine, or manslaughter to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if the individual could presently not be convicted of murder, attempted murder, or manslaughter because of changes to sections 188 and 189. (*Curiel*, *supra*, 15 Cal.5th at pp. 449-450; *Strong, supra*, 13 Cal.5th at p. 708.)

If the petition contains all the required information, including a declaration by the petitioner that he or she is eligible for relief based on the requirements of subdivision (a), the sentencing court, upon request, must appoint counsel to represent the petitioner. (§ 1172.6, subd. (b)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 962-963.) After briefing by the parties, the court must hold a hearing to determine whether the petitioner has made a prima facie showing of entitlement to relief. (§ 1172.6, subd. (c); see *Curiel, supra*, 15 Cal.5th at p. 450.)

If the petitioner makes the requisite prima facie showing of entitlement to relief, the superior court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the challenged conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subds. (c) & (d)(1).) If, however, "the petition and record in the case establish conclusively that the defendant is ineligible for relief," the court may deny (or dismiss) the petition. (*Strong, supra*, 13 Cal.5th at p. 708; accord*, Curiel, supra*, 15 Cal.5th at p. 450; see § 1172.6, subd. (c).)

Section 1172.6, subdivision (d)(3), provides that at the evidentiary hearing, "the burden of proof shall be on the

prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.  The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed."  Further, "[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."  (§ 1172.6, subd. (d)(3).)

We review the superior court's decision to deny the petition after an evidentiary hearing for substantial evidence but review independently "whether the trial court misunderstood the elements of the applicable offense."  (*People v. Reyes* (2023) 14 Cal.5th 981, 988-989.)

B.      *Substantial Evidence Supports the Superior Court's Finding of Aider and Abettor Liability*

"'[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.'"  (*Reyes, supra*, 14 Cal.5th at p. 990; accord, *People v. Rivera* (2021) 62 Cal.App.5th 217, 232 [after Senate Bill 1437 was enacted, "a person may still be convicted of second degree murder, either as a principal or an aider and abettor, 'if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life'"].)

"'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes, supra*, 14 Cal.5th at pp. 990-991; accord, *People v. Powell* (2021) 63 Cal.App.5th 689, 712-713.)

Flores contends there is insufficient evidence to support the superior court's finding beyond a reasonable doubt that Flores aided and abetted second degree implied malice murder. He asserts the evidence, at most, shows he had the intent to intimidate the young men by having Torres fire the gun at them, and neither he nor Torres intended to kill anyone. Flores's argument misapprehends the applicable standard for implied malice murder.

As discussed, to prove implied malice murder, there is no requirement that the perpetrator or the aider and abettor possess the intent to kill. The relevant inquiry here is whether Flores knew Torres intended to commit the act (shooting the gun at the group standing outside the car), intended to aid Torres in the shooting, knew the shooting was dangerous to life, and acted in

13

conscious disregard for life. (*Reyes, supra*, 14 Cal.5th at p. 992.) The evidence amply supports the superior court's finding that these requirements were met. Torres testified Flores gave him the gun and told him repeatedly to "blast" the men. Flores drove Torres directly to the group, pulled over, and watched as Torres retrieved the gun and extended it out the window. It is a reasonable inference that Flores knew Torres intended to shoot the gun from the car at the group of men. It is also a reasonable inference that Flores knew shooting a gun from a car into a group of people standing within four feet of the car was dangerous to human life. Finally, the evidence supports a finding Flores acted in conscious disregard for human life by creating the dangerous situation (by giving Torres the gun and telling him to blast the men, then pulling up to them in his car) and fleeing the scene.

Flores also argues the superior court erred by basing its credibility finding on a statement in our opinion in *Flores I* that the jury found Torres to be credible. In explaining its findings the court stated, "The court of appeals [*sic*] opinion summarizes the facts that were presented in this case that was found to be true for the verdicts that were rendered. The court of appeals [*sic*] specifically states the jury did find Mr. Torres's testimony to be credible. And it's not just because Mr. Torres testified. I believe it's because of all the evidence together." Flores contends our opinion in *Flores I* did not state the jury found Torres to be credible, and the superior court erred by relying on the purported credibility finding by the jury and this court. Although Flores is correct that we did not address Torres's credibility in our opinion, his argument is unavailing. The court stated it had reviewed the trial transcripts, and it explained its factual findings in detail, including its finding that Flores's testimony was not credible. In

14

context, it is clear the court's comment about our opinion on the jury's credibility findings was not the basis for its own credibility findings.

Finally, Flores argues the superior court erred in finding that Flores's testimony was inconsistent because "[t]he versions of Torres and Mr. Flores . . . [are] consistent in many ways." However, the fact finder "is the ultimate judge of credibility" and "may find a witness is credible in some respects and not in others; it may believe parts of a witness's testimony without believing all of it." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1029; see *People v. Williams* (1992) 4 Cal.4th 354, 364 ["a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others"].) The court was not required to believe all of Flores's testimony simply because it was consistent in some respects with other evidence. We defer to the court's credibility findings. (*People v. Brown* (2014) 59 Cal.4th 86, 106; *People v. Maury* (2003) 30 Cal.4th 342, 403.)

## DISPOSITION

The order denying Flores's petition for resentencing is affirmed.

FEUER, J.

We concur:

MARTINEZ, P. J.          STONE, J.

15