Filed 3/25/26  In re L.C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.C.,<br><br>        Defendant and Appellant. | A173033<br><br>(Mendocino County Super Ct. No. 25JD0002603) |

L.C. appeals from a disposition order adjudging him a ward of the court after a contested hearing in which the juvenile court found beyond a reasonable doubt that L.C. committed the felony offense of criminal threats (Pen. Code,[1] § 422) based on testimony that L.C., whom the victim believed to be a "gangbanger" and a "Norteno," directed the victim to "get on your knees because we're going to kill you" and "put a bullet through your head."  In this appeal, L.C. challenges the gang references as "hearsay" and argues the record is "devoid of evidence that any gang affiliation was connected to the offense."  Thus, he contends the juvenile court's imposition of gang-related probation conditions was error.  We disagree, concluding that (1) L.C. has

_____

[1]Further undesignated statutory references are to the Penal Code.

1

forfeited his claim, and, even if not, (2) the conditions imposed were appropriately evidence-based and "reasonably related to . . . future criminality." (*People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*) superseded by statute on another ground as stated in *People v. Moran* (2016) 1 Cal.5th 398, 403, fn. 6.) We therefore affirm.

## BACKGROUND

In four different wardship petitions filed between February 2024 and March 2025, L.C. was alleged to have committed crimes arising out of four different incidents that occurred between January and August 2024. Three of the petitions were resolved by negotiated dispositions, and one—the third petition involving criminal threats that is the subject of this appeal—was decided after a jurisdictional hearing.

### I. The First, Second, and Fourth Petitions[2]

In the first petition, L.C. was alleged to have brought a weapon on school grounds on January 5, 2024 (§ 626.10, subd. (a)(1)), specifically, a knife that was "nine-and-one half inches in overall length and had a five-inch fixed blade."

In the fourth petition, L.C. was alleged to have committed on February 1, 2024, felony vandalism/damage or destruction of property of $400 or more (§ 594, subd. (b)(1)) and felony taking of a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a)).

The second petition alleged L.C. entered a "Granny Unit of a residence or inhabited portion of a residence" in Fort Bragg on August 8, 2024, with the intent to commit larceny and then "willfully and/or unlawfully" took a "rifle

---

[2] With the exception of the third petition, which was filed on January 23, 2025, based on a June 23, 2024 incident, we discuss the incidents chronologically, not in the order in which they were charged.

and a revolver." L.C. was charged with felony burglary in the first degree (§ 459/460, subd. (a)) and felony grand theft of a value greater than $950, to wit, a rifle and a revolver (§ 487, subd. (a)).

On January 28, 2025, by way of a negotiated disposition, L.C. admitted the first petition, the misdemeanor violation of section 626.10 for bringing or possessing a knife on school grounds, and the second petition, arising out of the August 2024 burglary allegations, was dismissed. The associated disposition hearing trailed the jurisdictional hearing on the third petition concerning the criminal threats allegations discussed below.

The fourth petition was resolved on April 24, 2025, by way of a negotiated disposition—days after the instant notice of appeal was filed—in which L.C. admitted misdemeanor vandalism in violation of section 594, subdivision (b)(1), and the court dismissed the vehicle theft charge. In L.C.'s associated waiver of rights form completed and filed in connection with his admission, L.C. waived his "right to appeal, or ask another court to look at, decisions by the judge that [he] disagree[d] with." According to the minute order accompanying the change of plea, L.C. was to be continued on probation under "[a]ll previous terms and conditions."[3]

## II. The Third Petition

The third petition was filed on January 23, 2025, before the resolution of the first and second petitions, and alleged L.C. willfully threatened to commit a crime, "which will result in death or great bodily injury" to Manuel Gonzalez Sanchez, the ex-boyfriend of his mother. (§ 422.) On June 23, 2024, Gonzalez Sanchez was inside his trailer home when he heard L.C. and his brother yell at him to "get out" and "get on your knees because we're going to

---

[3] According to L.C., the proceedings on April 24, 2025, "were apparently not reported."

3

kill you." Gonzalez Sanchez had dated L.C.'s mother for more than two and a half years and had heard L.C.'s voice many times. L.C. and his brother each said they "were going to put a bullet through [Gonzalez Sanchez's] head." L.C.'s brother kicked the door to the trailer, making "a hole in the door." "[H]e poked his head through" and then "inserted his whole hand to try to open the lock." While L.C.'s brother kicked at the door, Gonzalez Sanchez told the assailants to leave and called 911. Gonzalez Sanchez identified the individuals trying to harm him as L.C. and his brother and explained to the 911 operator, "They say they were going to kill me and shit. They going to fucking shoot me, I don't know what the fuck they trying to do . . . . Yeah they gang bangers so they, they, I guess they got guns and whatever." The operator asked Gonzalez Sanchez to clarify if the assailants were involved in a gang, and he responded, "Yeah they Nortenos I guess. They just fucking destroy my door and everything."

After L.C.'s brother saw Gonzalez Sanchez was on the phone with the police, he and L.C. fled the area in a vehicle. The whole incident lasted less than five minutes.

At the March 13, 2025 jurisdictional hearing, the responding police officer testified and authenticated photographs of the hole in the trailer's door. The 911 call was played and admitted into evidence as an excited utterance over L.C.'s hearsay objection.[4] Gonzalez Sanchez also testified consistent with the above, explaining he had been able to identify L.C. and his brother as the individuals who came to his home and threatened him because he saw L.C.'s brother when he poked his head through the door and

---

[4] On appeal, L.C. renews his complaint that Gonzalez Sanchez's statements made to 911 about L.C.'s gang involvement were "based on unspecified hearsay."

4

also recognized L.C. and his brother by their voices, which "sound different." As relevant to this appeal, Gonzalez Sanchez stated that he was "scared" during the incident and believed the threats made because he believed L.C. was in a gang[5] "because [L.C.] has four points on his hand tattoo—the tattoo on his hand, and I've also heard [from] his mother."[6] Gonzalez Sanchez continued, "that's a sign of the gang, supposedly; the three or four points."

At the conclusion of the jurisdictional hearing, the court found the third petition to be true and continued the matter for disposition.

In the subsequently filed disposition report and recommendation, the probation department confirmed L.C. "has gang tattoos" and represented that while L.C. was detained in juvenile hall, a youth correctional officer observed gang tagging in L.C.'s room on the wall that suggested "[L.C.] may be a member or associate with members of the Norteno Criminal Street Gang" including "red markings of a Huelga bird, '14', and 'VLN' (Varrio Loco Norteno). Nortenos are associated with the color red and the number '14' and

---

[5] Gonzalez Sanchez initially testified he was scared because, "they belong to a gang." The court sustained L.C.'s objection to this gang reference as lacking foundation but did not strike the statement and permitted the district attorney to "lay some foundation for the knowledge that he has." The testimony about L.C.'s tattoo followed.

[6] L.C. repeated his foundational objections, which the court overruled, allowing the testimony "as to the reasonableness of this witness's perception. What's important in the court's mind is what this witness believed about the perpetrator not necessarily whether the minor is an active gang member or—or a member of what we call a group that meets the definition of a gang. It's more the perception of what surrounds that perception is how the court is receiving it." The court also overruled L.C.'s hearsay objection to Gonzalez Sanchez's statement, "I've also heard his mother," because "There's no particular statement the court has."

the fourteenth letter of the alphabet is 'N.' "[7] The probation department noted L.C. had "behavioral issues" at school and had only been present for six days since his February 2025 enrollment. On February 5, 2025, his first day attending his new school, L.C. " 'bullied a kid to tears' " and instigated a fight; and on February 11, L.C. was "observed on school video surveillance drawing gang symbols on a classroom whiteboard and another student's artwork."

The report also included a statement to an investigating police officer by L.C.'s mother that had not been introduced at the jurisdictional hearing. L.C.'s mother represented that L.C.'s brother "had previously been found with a 'ghost gun' but stated the gun belonged" to L.C. She explained that L.C.'s father "had found the gun, but was too scared to dispose of it because he feared [L.C.'s] gang friends would shoot him if he did."

The probation department assessed L.C. to have a high risk of re-offense because of factors including: "criminal associates, antisocial personality, and antisocial behavior." The probation department was "concerned with [L.C.'s] gang involvement," because "although the minor has denied any gang involvement, [he] has repeatedly tagged gang symbols not only on school property but also while in custody at the juvenile hall. [His] brother is a known gang member, and the minor has gang tattoos symbolizing allegiance with the criminal street gang." Accordingly, the probation department recommended that L.C. be declared a ward of the court and placed on formal probation with "standard terms and conditions" and "gang terms."

---

[7] The report represents the gang tagging was observed on March 11, 2024, but L.C.'s custodial history suggests the 2024 reference was a typographical error; the tagging was observed on March 11, 2025.

6

At the March 27, 2025 disposition hearing on the first and third petitions, the court admitted the probation report into evidence without objection from the parties, who, with limited comment, submitted on the report and probation's recommendation.

The court stated it would "go along with the recommendation," declared L.C. a ward pursuant to Welfare and Institutions Code section 602, with a maximum aggregated confinement time of two years and four months, and ordered L.C. to serve 90 days in juvenile hall with 48 days credit for time served, pay restitution, and complete 25 hours of community service. The court also ordered L.C. to "stay away from/have no contact" with Gonzalez Sanchez and ordered the "standard probation conditions." The court further directed L.C. to abide by gang terms while on probation: "[Y]ou shall not be a member of or act in furtherance of or for the benefit or associate with any organization or group of three or more people that you know to be a criminal street gang. You're not to associate with any person known to you to be a criminal street gang member, and you shall not be in any areas where criminal street gang members are known to you to meet or gather or areas known or told to you by probation that are known for gang-related activity. [¶] You're not to wear or display items or emblems reasonably known to you or your probation officer informs you are associated [with] or symbolic of gang membership, and you shall submit to photographing as directed by probation or other law enforcement. [¶] You're not to possess any articles that are known to be graffiti materials like acid, spray paint cans, marker pens. [¶] You shall not obtain any new gang-related tattoos, brands, burns, piercings, or scarring, and shall submit to photographing of all tattoos that exist to date. [¶] You're not to remain in any building, vehicle, or in the presence of any person where any dangerous or deadly weapons or firearms or

7

ammunition are known to you to exist.  No weapons, including firearms or ammunition."

L.C. timely appeals.

## DISCUSSION[8]

L.C. contends that the trial court erred in imposing gang conditions because the record is "devoid of evidence that any gang affiliation was connected to the offense" and the "motivation for the offense certainly was not gang-related," thus, he argues, " 'any connection between [the Minor's] offense and gang activity is speculation,' " citing *In re Edward B.* (2017)

---

[8] On January 13, 2026, we asked the parties to file letter briefs as to whether L.C.'s negotiated disposition to the fourth petition in which he accepted "All previous terms and conditions of probation" moots his current appeal.  L.C. contends the issue is not moot; the fourth petition is unrelated to the third petition and was "resolved independently"; he did not stipulate to "gang registration" in resolving the fourth petition.

The Attorney General disagrees, stating that L.C. "subsequently negotiating resolution of the fourth petition, waiving his right to appeal the judgment, and accepting the same probation conditions originally imposed in connection with the first and third petitions, rendered moot his present challenge to the gang probation conditions" because any "reversal of the challenged conditions . . . would be without any practical effect."  Neither party provided any information about subsequent proceedings that may be relevant to the issue of mootness or this appeal.

We agree with the Attorney General that because, according to the available record, L.C. appears to have accepted the same gang conditions contested here in a subsequent petition's disposition, reversal on appeal would not provide him with "effectual relief." (*In Re Antoine D.* (2006) 137 Cal.App.4th 1314, 1324 ["An appeal is moot, and should be dismissed, when any ruling by this court would not have practical impact or provide the parties effectual relief"].)  However, because there is no transcript verifying the scope of the accepted and ordered conditions on the fourth petition, we exercise our discretion to reach the merits of this appeal.  (*In re D.P.* (2023) 14 Cal.5th 266, 282 ["Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute"].)

8

10 Cal.App.5th 1228, 1236 (*Edward B.*). We conclude L.C.'s failure to object has forfeited this argument, but even if not, it has no merit.

## I. Forfeiture

As the Attorney General points out and L.C. concedes, his counsel at the dispositional hearing did not object to the juvenile court's imposition of the gang-related probation conditions. While the Attorney General therefore asserts forfeiture (citing *People v. Gonzalez* (2020) 57 Cal.App.5th 960, 978 ["It is well established that a defendant may not raise a *Lent* challenge for the first time on appeal"]), L.C. contends the issue is not forfeited because the failure to object could not have been a tactical decision; his counsel was ineffective. In the alternative, L.C. contends that the court should reach the issue because "juvenile delinquency probation conditions often receive appellate review in the absence of an objection in the juvenile court."[9] (Citing *In re Sheena K.* (2007) 40 Cal.4th 875, 884–886.) We agree that L.C.'s failure to object forfeited the issue on appeal, but as stated below, exercise our discretion to decide the propriety of the conditions imposed.

First, " ' "[n]o procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " [Citations.]

___

[9] On reply, L.C. expands his argument for review, asserting that the imposed gang conditions improperly infringe upon his "constitutionally protected right of free association" and claims L.C. is "constitutionally entitled to spend time with his brother, regardless of whether his brother is a gang member" because the due process clause of the United States Constitution "protects the right of families to live together as families." (Citing *Moore v. City of East Cleveland* (1977) 431 U.S. 494.) But because L.C. failed to raise these arguments in his opening brief, he has forfeited them; we do not discuss them further. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 ["the claim is omitted from the opening brief and thus waived"].)

'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]' " (*In re Sheena K.*, *supra*, 40 Cal.4th at pp. 880–881.)

Second, the abundance of evidence of L.C.'s gang involvement or risk thereof suggests that the decision of L.C.'s trial counsel not to object to the gang conditions was an appropriate tactical decision. L.C. was named in four wardship petitions involving varied criminal conduct over a period of eight months. Much of this conduct and L.C.'s personal behavior at school and at the juvenile hall demonstrated, at minimum, a risk of gang involvement, if not direct involvement. Considering this record, the trial counsel's decision not to object to the gang conditions appears tactically effective rather than ineffective assistance. (*People v. Price* (1991) 1 Cal.4th 324, 387 superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161–1162 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"]; *People v. Kelly* (1992) 1 Cal.4th 495, 540 ["An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel"].) However, we need not analyze L.C.'s trial counsel's decision not to object to the probation conditions because we exercise our right to decide the appeal on its merits in the alternative. (*People v. McCullough* (2013) 56 Cal.4th 589, 593 ["neither forfeiture nor application of the forfeiture rule is automatic," and appellate courts have discretion to review otherwise forfeited challenges].)

## II. The Imposition of Gang Conditions

Turning to the merits, we disagree with L.C.'s contention that because the June 2024 threats may have been spurred by domestic violence, the record is "devoid of evidence that any gang affiliation was connected to the

10

offense" and instead conclude that (1) the record's evidence of gang involvement or risk of gang involvement and its "relationship to the crime of which the offender was convicted" provides sufficient basis to impose gang conditions, and (2) because the gang conditions forbid conduct " ' "reasonably related to future criminality," ' " their imposition was not an abuse of discretion. (*People v. Olguin* (2008) 45 Cal.4th 375, 379 (*Olguin*); *Lent*, *supra*, 15 Cal.3d at p. 486.)

On appeal, "We review conditions of probation for abuse of discretion." (*Olguin*, *supra*, 45 Cal.4th at p. 379.) "That is, a reviewing court will disturb the trial court's decision to impose a particular condition of probation only if, under all the circumstances, that choice is arbitrary and capricious and is wholly unreasonable." (*People v. Moran*, *supra*, 1 Cal.5th at p. 403.) Courts may impose conditions that have a " ' "relationship to the crime of which the offender was convicted" ' " (*Olguin*, at p. 379) and may also "impose conditions to foster rehabilitation and to protect public safety." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.)

A "condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' " (*Lent*, *supra*, 15 Cal.3d at p. 486.) The connection between a probation condition and future criminality must be more than abstract or hypothetical, meaning there must be a strong connection between "the burdens imposed by the challenged condition and a probationer's criminal conduct or personal history." (*In re Ricardo P.* (2019) 7 Cal.5th 1113, 1120–1121 (*Ricardo P.*).) Conditions of probation may properly be based on information in a probation report unrelated to a prior offense that raises concerns about future criminality.

11

(*Id.* at p. 1122.) The *Lent* test "is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term." (*Olguin, supra,* 45 Cal.4th at p. 379; *Edward B., supra,* 10 Cal.App.5th at p. 1236 ["But because the gang condition imposed by the juvenile court prohibits Edward from engaging in otherwise legal conduct, we can uphold it only if there is a reasonable connection between the condition and the offense *or* between the condition and future criminality" (italics added)].) In other words, "even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality." (*Olguin,* at p. 380, citing *People v. Carbajal, supra,* 10 Cal.4th at p. 1121.) "Although *Lent* involved an adult probationer, the Courts of Appeal have 'consistently held that juvenile probation conditions must be judged by the same three-part standard applied to adult probation conditions under *Lent.*'" (*Ricardo P.,* at pp. 1118–1119.)

L.C.'s briefing primarily focuses on the first prong under *Lent*; he contends that "the record on appeal [is] devoid of substantial evidence that [L.C.] was gang-affiliated at the time of the offense, it is also devoid of evidence that any gang affiliation was connected to the offense." L.C. compares his case to *Edward B.,* where, with the Attorney General's agreement, the Court of Appeal struck the gang conditions imposed in a purse-snatching case because there was no "reasonable factual nexus": and "[a]ny connection between Edward's offense and gang activity is speculation" and "the absence of evidence of gang affiliation or association with gang members or risk of gang involvement on Edward's part, the gang condition is not tailored to his future criminality." (*Edward B., supra,* 10 Cal.App.5th at p. 1236.) L.C. argues that here, too, "'any connection between [the Minor's]

12

offense and gang activity is speculation,' " because L.C. threatened to kill Gonzalez Sanchez because he had "engaged in domestic violence against [L.C.'s] mother earlier the same day"; the offense was not motivated by gang activity.[10]  L.C. further contends that the gang conditions cannot be justified as a general deterrent for future criminality because there is "no connection between [L.C.'s] apparent interest in gang culture, and criminality past or future."

We first address L.C.'s argument under the first *Lent* prong that the gang conditions have " ' "no relationship to the crime of which the offender was convicted." ' "  (*Olguin, supra*, 45 Cal.4th at p. 379.)  Here, the gravamen of L.C.'s appeal rests on his claim that the assault against Gonzalez Sanchez was motivated by L.C.'s personal animus toward him rather than specific gang activity.  But even if L.C.'s claims of a domestic violence incident being his motivation (i.e., revenge) are true, they do not negate the first *Lent* prong.  Assaultive conduct is by definition violent.  (§ 240 ["An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another"].)  As L.C. acknowledges in his briefs, "Street gangs are doubtless responsible for much violence in our society today" and frequently engage in conduct motivated by "revenge" or a perceived wrong of another.  (See, e.g., *People v. Vu* (2006) 143 Cal.App.4th 1009, 1025 [defendant was a member of the Tiny Rascals Gang who "expressly or tacitly reached an agreement to murder [a victim], mistaken to be an Asian Boyz gang member,

---

[10] L.C.'s father represented to the probation department that L.C. "found out his mother was physically abused by [Gonzalez Sanchez], which is what started this incident."  L.C. expressed remorse to the probation department for how the incident impacted his mother, but "did not feel bad" for Gonzalez Sanchez, saying he "deserved it" because Gonzalez Sanchez "hit his mother, and he did not want his mother and him to be together."

as revenge for the killing" of another fellow gang member].) That is exactly what L.C. did here. At the time of the assault, neither he nor his mother was in imminent danger or being threatened by Gonzalez Sanchez. In fact, according to L.C., he had learned of the domestic violence "earlier that day." An earlier claim of danger or fear does not afford an affirmative defense for defense of others. (*People v. Michaels* (2002) 28 Cal.4th 486, 530 ["defense of others requires a fear of *imminent* harm"].) Yet L.C. partnered with his brother, an acknowledged gang member—per the testimony of Gonzalez Sanchez, the recitations in the probation report, and L.C. in his appellate briefs—in order to exact revenge on Gonzalez Sanchez, threatening to kill him and "put a bullet through [his] head." As L.C. stated, he "did not feel bad" for Gonzalez Sanchez; in fact, the incident was "not . . . memorable enough to remember."

Moreover, L.C.'s "no relationship" argument ignores the fact that the March disposition hearing also concerned the first petition, in which L.C. admitted having brought a nine-inch knife to school. The combination of these circumstances more than satisfies the imposition of gang conditions under the first *Lent* prong, even without considering the additional evidence of gang involvement included in the probation report.

We next consider if the imposed gang conditions are "reasonably related to future criminality" as set forth in *Lent*'s third prong, discussed in the Attorney General's brief and L.C.'s reply brief.[11] (*Lent, supra,* 15 Cal.3d

---

[11] We need not reach the second prong because the *Lent* test "is conjunctive," and we conclude L.C. has failed to satisfy the first and third prongs, which are the focus of the parties' briefing. (*Olguin, supra,* 45 Cal.4th at p. 379.) Moreover, no party contests the second prong, the criminality of the prohibited conduct, seemingly because "under Penal Code section 186.22, active participation in a street gang, defined as a criminal enterprise, is a crime." (*In re Laylah K.* (1991) 229 Cal.App.3d 1496, 1501

at p. 486.)  Gangs are known to be criminal enterprises.  (*In re Laylah K.*, *supra*, 229 Cal.App.3d at p. 1501 ["Association with gang members is the first step to involvement in gang activity"].)  Although L.C. denied being a member of a gang, the record contains substantial evidence to the contrary. Putting aside what Gonzalez Sanchez may have "heard" from L.C.'s mother (who separately reported that L.C. had a " 'ghost gun' " his father had found but was afraid to dispose of "because he feared [L.C.'s] gang friends would shoot him if he did"), Gonzalez Sanchez testified that L.C. had a tattoo of four points on his hand, which he understood to be a sign of gang association, specifically Nortenos.

L.C.'s own conduct supports Gonzalez Sanchez's suspicions.  For example, while L.C. was detained in juvenile hall, a Youth Correctional Officer saw that the wall of L.C.'s room had been tagged with "red markings of a Huelga bird, '14', and 'VLN' (Varrio Loco Norteno)."  The drawings suggested that L.C. "may be a member or associate with members of the Norteno Criminal Street Gang."  In addition to bringing a knife onto one school campus, the probation department also noted L.C.'s "behavioral issues" at his new school that can be considered gang related, including bullying, fighting, and drawing gang symbols on a "classroom whiteboard and another student's artwork."

Moreover, the probation department affirmed L.C. had tattoos "symbolizing allegiance with the criminal street gang" and was "concerned with [L.C.'s] gang involvement."  The probation department assessed L.C. to have a high risk of re-offense because of factors including:  "criminal

disapproved on other grounds in *In re Sade C.* (1996) 13 Cal.4th 952, 962, fn. 2, 983, fn. 13.)

associates, antisocial personality, and antisocial behavior." The probation department also represented that L.C.'s brother is a "known gang member."

These circumstances are in stark contrast with *Edward B.*, where the only "evidence" purportedly connecting the involved minor to a gang was his father's statement that one of his son's friends, " 'whom he believes his son, no longer associates with, has some involvement with a criminal street gang.' " (*Edward B.*, *supra*, 10 Cal.App.5th at p. 1234.) Conversely, here, as stated, there is plentiful evidence of L.C.'s gang association and risk of future gang involvement; the gang conditions imposed are therefore appropriately tailored to his future criminality. (See *id.* at p. 1236; *Lent*, *supra*, 15 Cal.3d at p. 486.)

L.C.'s suggestion that the record must show he was "gang-affiliated *at the time* of the offense" is not the standard for a reasonable connection between a condition and future criminality. (Italics added.) (*Ricardo P.*, *supra*, 7 Cal.5th at p. 1122.) Indeed, our Supreme Court has rejected the argument that *Lent*'s third prong requires " 'a nexus between the probation condition and the defendant's underlying offense or prior offenses.' " (*Ricardo P.*, at p. 1122.) The "conditions of probation aimed at rehabilitating the offender need not be so strictly tied to the offender's precise crime" as long as they are "reasonably directed at curbing [the defendant's] future criminality." (*People v. Moran*, *supra*, 1 Cal.5th at pp. 404–405.) "[C]ourts may properly base probation conditions upon information in a probation report that raises concerns about future criminality unrelated to a prior offense." (*Ricardo P.*, at p. 1122). Thus, "even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality." (*Olguin*, *supra*, 45 Cal.4th at

16

p. 380.) Where, as here, the imposition of gang conditions related to the underlying offenses and to preventing future criminality, their imposition was not error.[12] (*Lent, supra,* 15 Cal.3d at p. 486.)

## DISPOSITION

The judgment is affirmed.

---

[12] Because we find no error, we need not address L.C.'s single, unsupported assertion that the "imposition of gang conditions of juvenile probation is not harmless." (*People v. Lamb* (2024) 16 Cal.5th 400, 435 fn. 13 [the court need not address arguments where the court's conclusion on another issue is dispositive].)

DESAUTELS, J.


We concur:


RICHMAN, ACTING P. J.


MILLER, J.


*In re L.C.* (A173033)